Barry I. Levy, Esq.
Michael Vanunu, Esq.
Joanna Rosenblatt, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and
GEICO CASUALTY COMPANY,

                               Plaintiffs,

              -against-

HARMONY OS LLC, ABRAHAM RADZIK,
NEXGEN LINE INC., ADAM BENNISSIM a/k/a
GIORA ADAM BENNISSIM, TM OS LLC, VITAL
CRAFT OS LLC, MARK PELTA, WELLSPRING
SOLUTIONS LLC, PINNACLE OS LLC, JOSEPH
SCALA, BSD OS LLC, LUMINEX BK LLC,
YITZHAK RAHMAN, PLATINUM LINE INC.,
IGOR ABAYEV, and JOHN DOE DEFENDANTS
"1" through "10",

                              Defendants.
-----------------------------------------------------------------X

Docket No.:_____ (        )

**Plaintiff Demands a Trial by Jury**

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, hereby allege as follows:

1

## INTRODUCTION

1.      GEICO brings this action to recover more than $1,000,000.00 that Defendants have wrongfully obtained from GEICO by submitting and causing to be submitted thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable durable medical equipment ("DME") comprised of medically unnecessary pneumatic compression devices ("PCDs"), transcutaneous electrical joint stimulation devices ("TEJSDs"), and osteogenesis stimulators (collectively, the "Fraudulent Equipment") through a series of companies known as Harmony OS LLC ("Harmony OS"), Nexgen Line Inc. ("Nexgen"), TM OS LLC ("TM OS"), Vital Craft OS LLC ("Vital Craft"), Wellspring Solutions LLC ("Wellspring"), BSD OS LLC ("BSD"), Luminex BK LLC ("Luminex"), Pinnacle OS LLC ("Pinnacle"), and Platinum Line Inc. ("Platinum Line") (collectively, the "DME Providers").  The Fraudulent Equipment is alleged have been provided to individuals who claimed to have been involved in automobile accidents in New York and were eligible for coverage under no-fault insurance policies issued by GEICO ("Insureds").

2.      The DME Providers are all New York companies that are purportedly owned by Yitzhak Rahman ("Rahman"), Abraham Radzik ("Radzik"), Adam Bennissim a/k/a Giora Adam Bennissim ("Bennissim"), Mark Pelta ("Pelta"), Joseph Scala ("Scala"), and Igor Abayev ("Abayev") (collectively, the "Paper Owner Defendants"), who in conjunction with others not presently identifiable to GEICO, devised a scheme to obtain medically unnecessary and often duplicated/photocopied prescriptions from healthcare providers working out of no-fault clinics in the New York metropolitan area (the "Referring Providers") through unlawful kickbacks and other financial incentives.  Once the prescriptions were secured, Defendants then billed GEICO collectively more than $5.5 million, with each DME Provider making virtually identical fraudulent misrepresentations to GEICO concerning the types of Fraudulent Equipment allegedly provided

to Insureds. As part of their scheme to extract money from GEICO without detection, Defendants shifted the billing submitted to GEICO from one DME Provider to the next over the course of several years and continue to do so through the present day.

3.    GEICO seeks to terminate this fraudulent scheme and recover more than $1,000,000.00 that has been wrongfully obtained by the DME Providers, the Paper Owner Defendants, and John Doe Defendants "1" – "10" (the "John Doe Defendants") (collectively, the "Defendants") since 2023 and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $4.3 million in pending no-fault insurance claims that have been submitted by or on behalf of the DME Providers since 2023 because:

(i)    Defendants billed GEICO for Fraudulent Equipment when they were ineligible to collect No-Fault Benefits because they failed to comply with local licensing requirements;

(ii)    Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and was prescribed as a result of unlawful financial arrangements with others who are not presently identifiable;

(iii)    Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and was purportedly prescribed and provided pursuant to predetermined fraudulent protocols designed to exploit Insureds for financial gain, without regard for genuine patient care; and

(iv)    Defendants billed GEICO for PCDs and osteogenesis stimulators that were provided – to the extent provided – as a result of decisions made by laypersons, not based upon prescriptions issued by the Referring Providers who are licensed to issue such prescriptions.

4.    The Defendants fall into the following categories:

(i)    The DME Providers are New York companies that purport to purchase DME from wholesalers, purport to provide the Fraudulent Equipment to automobile accident victims, and bill New York automobile insurance companies, including GEICO, for Fraudulent Equipment;

(ii)    Defendant Radzik is listed on paper as the owner, operator, and controller of Harmony OS, when, as discussed below, Radzik works for one of the John Doe Defendants who secretly operated, managed, controlled and financially benefited from all the DME Providers, and used Harmony OS to

3

submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(iii) Defendant Bennissim is listed on paper as the owner, operator, and controller of Nexgen and Wellspring, when, as discussed below, Bennissim works for one of the John Doe Defendants who secretly operated, managed controlled and financially benefited from all the DME Providers, and used Nexgen and Wellspring to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(iv) Defendant Pelta is listed on paper as the owner, operator, and controller of TM OS and Vital Craft, when, as discussed below, Pelta works for one of the John Doe Defendants who secretly operated, managed controlled and financially benefited from all the DME Providers, and used TM OS and Vital Craft to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(v) Defendant Scala is listed on paper as the owner, operator, and controller of Pinnacle OS, when, as discussed below, Scala works for one of the John Doe Defendants who secretly operated, managed controlled and financially benefited from all the DME Providers, and used Pinnacle OS to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(vi) Defendant Rahman is listed on paper as the owner, operator, and controller of BSD and Luminex, when, as discussed below, Rahman works for one of the John Doe Defendants who secretly operated, managed controlled and financially benefited from all the DME Providers, and used BSD and Luminex to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(vii) Defendant Abayev is listed on paper as the owner, operator, and controller of Platinum Line, when, as discussed below, Abayev works for one of the John Doe Defendants who secretly operated, managed controlled and financially benefited from all the DME Providers, and used Platinum Line to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims; and

(viii) The John Doe Defendants are citizens of New York and are presently not identifiable but are: (i) secretly controlling and profiting from the DME Providers; (ii) associated with the Referring Providers and various multi-

4

disciplinary medical offices that purportedly treat high-volume of No-Fault insurance patients (the "Clinics"); (iii) are the sources of prescriptions to the DME Providers; and/or (iv) conspired with the Paper Owner Defendants to further the fraudulent schemes against GEICO and other automobile insurers.

5.     As discussed below, Defendants have always known that the claims for Fraudulent Equipment submitted to GEICO were fraudulent because:

(i)     The bills for Fraudulent Equipment submitted by Defendants to GEICO fraudulently misrepresented that Defendants complied with all local licensing requirements when Defendants were never lawfully licensed to provide the Fraudulent Equipment by the New York City Department of Consumer and Worker Protection, as they misrepresented the ownership and/or business premises address for each of the DME Providers;

(ii)     The Fraudulent Equipment provided – to the extent that any Fraudulent Equipment was provided – was medically unnecessary and based upon phony prescriptions, including ones that were duplicated/photocopied, obtained as a result of unlawful financial arrangements between Defendants and others who are not presently identifiable and, thus, not entitled for no-fault insurance reimbursement in the first instance;

(iii)     The prescriptions for Fraudulent Equipment were not medically necessary and the Fraudulent Equipment was provided – to the extent provided – pursuant to predetermined fraudulent protocols created by Defendants and others not presently identifiable to GEICO to enrich themselves, rather than to treat or otherwise benefit the Insureds; and

(iv)     The PCDs and osteogenesis stimulators were provided – to the extent provided – as a result of decisions made by laypersons, not based upon prescriptions issued by licensed healthcare providers.

6.     As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through the DME Providers.

7.     The charts attached hereto as Exhibits "1" through "9", set forth a representative sample of the fraudulent claims that have been identified to date that were submitted, or caused to be submitted, to GEICO pursuant to Defendants' fraudulent scheme through Harmony OS, Nexgen, TM OS, Vital Craft, Wellspring, Pinnacle, BSD, and Luminex.

8.     The Defendants' fraudulent scheme against GEICO and the New York automobile

insurance industry has been ongoing for many years and began no later than May 2023. The fraudulent scheme has continued uninterrupted since that time.

9.      As a result of Defendants' fraudulent scheme, GEICO has incurred damages of more than $1,000,000.00.

## THE PARTIES

### I.      Plaintiffs

10.      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are each Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

### II.      Defendants

11.      John Doe Defendant "1" (hereinafter, the "Secret Owner") is a citizen of New York and is presently not identifiable but is secretly controlling and profiting from the DME Providers, and conspired with others, who are not presently identifiable, at various Clinics to obtain prescriptions purportedly issued by the Referring Providers that were used by the DME Providers to submit bills to GEICO, and other New York automobile insurers, seeking payment for the Fraudulent Equipment.

12.      Defendant Radzik is domiciled in, resides in, and is a citizen of New York and is listed as the paper owner of Harmony OS.

13.      Defendant Harmony OS is a New York corporation with its principal place of business in Brooklyn, New York. Harmony OS was incorporated on November 9, 2023 and is owned on paper and purportedly operated and controlled by Radzik. In actuality, the Secret Owner operated, managed, controlled and financially benefited from Harmony OS and, with the aid of

Radzik, used Harmony OS as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

14.    Defendant Bennissim is domiciled in, resides in, and is a citizen of New York and is listed as the paper owner of Nexgen and Wellspring.

15.    Defendant Nexgen is a New York corporation with its principal place of business in Brooklyn, New York. Nexgen was incorporated on July 30, 2024 and is owned on paper and purportedly operated and controlled by Bennissim. In actuality, the Secret Owner operated, managed controlled and financially benefited from Nexgen and, with the aid of Bennissim, used Nexgen as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

16.    Defendant Wellspring is a New York corporation with its principal place of business in New York, New York. Wellspring was incorporated on March 11, 2024 and is owned on paper and purportedly operated and controlled by Bennissim. In actuality, Secret Owner operated, managed controlled and financially benefited from Wellspring and, with the aid of Bennissim, used Wellspring as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

17.    Defendant Pelta is domiciled in, resides in, and is a citizen of New York and is listed as the paper owner of TM OS and Vital Craft.

18.    Defendant TM OS is a New York corporation with its principal place of business in Glendale, New York. TM OS was incorporated on July 11, 2023 and is owned on paper and purportedly operated and controlled by Bennissim. In actuality, Secret Owner operated, managed controlled and financially benefited from TM OS and, with the aid of Bennissim, used TM OS as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

19.     Defendant Vital Craft is a New York corporation with its principal place of business in New York, New York. Vital Craft was incorporated on November 29, 2023 and is owned on paper and purportedly operated and controlled by Bennissim. In actuality, Secret Owner operated, managed controlled and financially benefited from Vital Craft and, with the aid of Bennissim, used Vital Craft as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

20.     Defendant Joseph Scala is domiciled in, resides in, and is a citizen of New York and is listed as the paper owner of Pinnacle.

21.     Defendant Pinnacle is a New York corporation with its principal place of business in New York, New York. Pinnacle was incorporated on February 27, 2024 and is owned on paper and purportedly operated and controlled by Scala. In actuality, Secret Owner operated, managed controlled and financially benefited from Pinnacle and, with the aid of Scala, used Pinnacle as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

22.     Defendant Yitzhak Rahman is domiciled in, resides in, and is a citizen of New York and is listed as the paper owner of BSD and Luminex.

23.     Defendant BSD is a New York corporation with its principal place of business in New York, New York. BSD was incorporated on May 8, 2023 and is owned on paper and purportedly operated and controlled by Rahman. In actuality, Secret Owner operated, managed controlled and financially benefited from BSD and, with the aid of Rahman, used BSD as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

24.     Defendant Luminex is a New York corporation with its principal place of business in New York, New York. Luminex was incorporated on May 8, 2023 and is owned on paper and purportedly operated and controlled by Rahman. In actuality, Secret Owner operated, managed

controlled and financially benefited from Luminex and, with the aid of Rahman, used Luminex as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

25.    Defendant Abayev is domiciled in, resides in, and is a citizen of New York and is listed as the paper owner of Platinum Line.

26.    Defendant Platinum Line is a New York corporation with its principal place of business in Queens, New York. Platinum Line was incorporated on September 5, 2024 and is owned on paper and purportedly operated and controlled by Abayev. In actuality, Secret Owner operated, managed controlled and financially benefited from Platinum Line and, with the aid of Abayev, used Platinum Line as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

## JURISDICTION AND VENUE

27.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

28.    Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

29.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred, and where one or more of Defendants reside.

## ALLEGATIONS COMMON TO ALL CLAIMS

30.    GEICO underwrites automobile insurance in the State of New York.

I.      **An Overview of the Pertinent Laws**

A.      **Pertinent Laws Governing No-Fault Insurance Reimbursement**

31.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

32.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

33.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD. See N.Y. Ins. Law § 5102(a).

34.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

35.     Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

36.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

37.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New

York Court of Appeals confirmed that healthcare service providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

38.     Title 20 of the City of New York Administrative Code imposes licensing requirements on healthcare providers located within the City of New York which engage in a business which substantially involves the selling, renting, repairing, or adjusting of products for the disabled, which includes DME.

39.     New York City's Administrative Code requires DME suppliers to obtain a Dealer in Products for the Disabled License ("Dealer in Products License") issued by the New York City Department of Consumer and Worker Protection ("DCWP") in order to lawfully provide DME to the disabled, which is defined as "a person who has a physical or medical impairment resulting from anatomical or physiological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques". See 6 RCNY § 2-271; NYC Admin. Code §20-425.

40.     It is unlawful for any DME supplier to engage in the selling, renting, fitting, or adjusting of products for the disabled within the City of New York without a Dealer in Products License.  See NYC Admin. Code §20-426.

41.     A Dealer in Products License is obtained by filing a license application with the DCWP. The application requires that the applicant identify, among other pertinent information, the commercial address of where the DME supplier is physically operating from.

42.     The license application for a Dealer in Products License also requires the applicant to affirm that they are authorized to complete and submit the application on behalf of the corporate entity seeking a license and that the information contained in the application is true, correct, and

complete. The affirmation to the application requires a signature that is made under penalty for false statements under Sections 175.30, 175.35, and 210.45 of New York's Penal Law.

43.     New York law also prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for referrals for DME. See, e.g., N.Y. Educ. Law §§ 6509-a, 6530(18), 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

44.     Prohibited kickbacks include more than simple payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party". See N.Y. Educ. Law §§ 6509-a, 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

45.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

46.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

47.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is

a crime.

48.    Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.    Pertinent Regulations Governing No-Fault Benefits for DME and OD**

49.    Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

50.    DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), cervical traction units, and whirlpool baths.

51.    To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME charges, the maximum charges that may be submitted by healthcare providers for DME are set forth in the New York State Workers' Compensation Board instituted the New York State Workers' Compensation Durable Medical Equipment Fee Schedule ("DME Fee Schedule"), which is reflected in 12 N.Y.C.R.R. 442.2.

52.    In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

53.    According to the DME Fee Schedule, certain pieces of DME have an established fee payable ("Fee Schedule item"), which is the maximum permissible charge for that specific item of DME based on its Healthcare Common Procedure Coding System ("HCPCS") Code, which provides specific characteristics and requirements that an item of DME must meet in order to qualify for reimbursement under that specific HCPCS Code.

54.    For Fee-Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning HCPCS Codes that should be used by DME companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME must meet in order to qualify for reimbursement under a specific HCPCS Code.

55.    The DME Fee Schedule uses HCPCS Codes promulgated by Palmetto to identify the maximum charge for selling specific DME and for renting Fee Schedule items on a weekly basis.

56.    Where a specific piece of DME does not have a maximum reimbursement rate in the DME Fee Schedule ("Non-Fee Schedule item"), then the fee payable by an insurer such as GEICO to the provider shall be the <u>lesser</u> of: (i) 150% of the acquisition cost to the provider; <u>or</u>

(ii) the usual and customary price charged to the general public.

57.    For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

58.    Effective June 1, 2023, the New York State Department of Financial Services issued an amendment to 11 N.Y.C.R.R. 68, adding Part E of Appendix 17-C, to address No-Fault reimbursement for rental charges of DME that does not have a reimbursement rate in the Fee Schedule or is not specifically identified within the Fee Schedule.

59.    For dates of service on or after June 1, 2023, Part E of Appendix 17-C of 11 N.Y.C.R.R. 68 establishes calculations for the maximum permissible daily rental rates of Non-Fee Schedule items and the maximum total accumulated charges, as follows:

(d)(1)  On or after June 1, 2023, the maximum permissible monthly rental charge for such durable medical equipment shall be one-tenth the acquisition cost to the provider. Rental charges for less than one month shall be calculated on a pro-rated basis using a 30-day month.

(2)    The total accumulated rental charge for such durable medical equipment shall be the least of the:

(i)      Acquisition cost plus 50%;

(ii)     Usual and customary price charged by durable medical equipment providers to the general public; or

(iii)    Purchase fee for such durable medical equipment established in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule.

15

60.     In essence, these new calculations establish a daily rental rate for Non-Fee Schedule items at 1/300th of the acquisition cost and establish a maximum total rental reimbursement per patient that is not to exceed the lesser of 150% of the acquisition cost of the item, the usual and customary price charged by other DME providers to the general public, or the purchase fee established in the Fee Schedule.

61.     Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i)      The provider is in compliance with all significant statutory and regulatory requirements;

(ii)     The provider received a legitimate prescription for reasonable and medically necessary DME from a healthcare practitioner that is licensed to issue such prescriptions;

(iii)    The prescription for DME is not based any unlawful financial arrangement;

(iv)     The DME identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s);

(v)      The HCPCS Code identified in the bill actually represents the DME that was provided to the patient; and

(vi)     The fee sought for DME provided to an Insured was not in excess of the price contained in the Fee Schedule or the standard used for a Non-Fee Schedule item or the *pro rata* monthly rental fee sought for renting DME to an Insured was not in excess of the standard for calculating rental reimbursement.

## II.     Defendants' Fraudulent Scheme

### A.     The DME Providers' Common Secret Ownership

62.     The John Doe Defendants conspired with the Paper Owner Defendants to implement a complex fraudulent scheme in which the DME Providers were used consecutively and in conjunction with each other over the course of several years to bill GEICO and other New

York automobile insurers for millions of dollars in No-Fault Benefits to which they were never entitled to receive.

63.     While each of the DME Providers were formed and listed as being independently owned by one of the Paper Owner Defendants, all of the DME Providers were actually controlled by the Secret Owner, who also profited from the fraudulent scheme committed against GEICO and other New York automobile-insurers.

64.     The Secret Owner was able to secretly control and profit from the DME Providers by using each of the Paper Owner Defendants as "straw" owners who would place their name on documents needed to be filed with the State of New York and City of New York to lawfully operate the DME Providers.

65.     In keeping with the fact that the Secret Owner actually owned, controlled, and profited from the DME Providers, and used the Paper Owner Defendants to further the fraudulent scheme herein, there is significant overlap in the operations of the various DME Providers that could only exist through the Secret Owner's involvement.

66.     For example, the existence of the Secret Owner who actually owned, controlled, and profited from the DME Providers is supported by the fact that each of the DME Providers identified the same phone number, (914) 308-1671 on the delivery receipts that were submitted to GEICO.

67.     Below are examples of the address and phone number associated with delivery receipts for each of the DME Providers:

| DME Provider | Paper Owner | Sample Delivery Receipt Using (914) 308-1671 |
|---|---|---|
| BSD | Rahman | **BSD OS**<br>224 W 35th St Ste 500 #587 New York, NY 10001<br>Tel. (914) 308-1671<br>—<br>**DELIVERY RECEIPT** |
| Harmony OS | Radzik | **HARMONY OS**<br>**442 LORIMER ST, SUITE D BROOKLYN, NY 11206**<br>Tel: (914) 308-1671<br>**DELIVERY RECEIPT** |
| Nexgen | Bennissim | **NEXGEN LINE**<br>**238 WILSON AVE, STE A BROOKLYN, NY 11237**<br>Tel: (914) 308-1671<br>**DELIVERY RECEIPT** |
| TM OS | Pelta | **TM OS**<br>**67-04 Myrtle Ave Glendale, NY 11385**<br>Tel: (914) 308-1671<br>**DELIVERY RECEIPT** |
| Vital Craft | Pelta | **Vital Craft OS**<br>**447 BROADWAY, FL 2**<br>**NEW YORK, NY, 10013, USA**<br>Tel: (914) 308-1671<br>**DELIVERY RECEIPT** |
| Wellspring | Bennissim | **WELLSPRING SOLUTIONS**<br>**276 5th Avenue, Suite 704 New York, NY 10001**<br>Tel: (914) 308-1671<br>**DELIVERY RECEIPT** |
| Pinnacle | Scala | **PINNACLE OS**<br>**1178 Broadway FL 2, New York NY 10001, USA**<br>Tel: (914) 308-1671<br>**DELIVERY RECEIPT** |

| Luminex | Rahman | **Luminex BK**<br>118-35 Queens Blvd Tower, Suite 400, Queens, NY 11375<br>Tel (914) 308-1671<br><br>**DELIVERY RECEIPT** |
|---|---|---|
| Platinum Line | Abayev | **PLATINUM LINE**<br>17561 Hillside Avenue, Jamaica, NY 11432, STE 202<br>Tel: (914) 308-1671<br><br>**DELIVERY RECEIPT** |

68.     The use of a single phone number to operate and manage each of the DME Providers, which purport to be eight separate and independent entities, would not be possible without the Secret Owner and Defendants' active participation in a common scheme.

69.     In addition to sharing a single phone number, as part of the common scheme involving the Secret Owner, the DME Providers each received medically unnecessary prescriptions for Fraudulent Equipment that were issued according to predetermined treatment protocols.

70.     For example, a single prescription purportedly issued by a Referring Provider for a "Pneumatic Compression Device", "Trans Elect JT Stim Dev System", "Neuromuscular stimulator, electronic shock unit device", "Non-thermal pulsed high frequency radiowaves high peak power electromagnetic energy device", and "Equipo Medico Infrared Heat Pad with Low Level Light Therapy" would be divided between Defendants and others, resulting in Nexgen purportedly providing the PCD using HCPCS Code E0675 for $2,826.20, Harmony OS purportedly providing the TEJSD using HCPCS Code E0762 for $808.25, and Bloom A Inc. ("Bloom A") purportedly providing the remaining prescribed devices.

71.     As a result of allocating prescriptions in this manner, each of the DME Providers was intentionally set up to bill GEICO exclusively for purportedly providing a single type of DME

billed under a single HCPCS code.

72.    To that end, when a Referring provider issued a "prescription" or "referral" (i) Harmony OS, TM, and Vital Craft exclusively dispensed and billed for TEJSDs under HCPCS E0762; (ii) BSD, Luminex, Wellspring, and Nexgen exclusively billed for PCDs under HCPCS E0675; (iii) Pinnacle exclusively billed for osteogenesis stimulators under HCPCS E0747 and, minimally, E0760; and (iv) Platinum Line exclusively billed for osteogenesis stimulators under HCPCS E0760 and PCDs under HCPCS E0675.

73.    As discussed further below, these prescriptions were not given to the Insureds for purposes of selecting their own provider, but routed directly to the DME Providers, who then purported to bill GEICO and other New York insurers for specific types of Fraudulent Equipment in an effort to (i) remove the Insured from the decision making process, and (ii) limit the amounts of billing submitted by any one DME Provider and mask the common scheme.

74.    In keeping with the fact that the Secret Owner actually owned, controlled, and profited from the DME Providers, and used the Paper Owner Defendants to further the fraudulent scheme herein, there the DME Providers that billed for the same type of Fraudulent Equipment operated in sequential order in an effort to limit the amount of billing submitted from any one of the DME Providers and mask the common fraudulent scheme.

75.    For example, the DME Providers that billed for PCDs operated in the following sequential manner:

    (i)    BSD billed GEICO purporting to provide Insureds with PCDs between June 29, 2023 and December 7, 2023;

    (ii)    Luminex billed GEICO purporting to provide Insureds with PCDs between November 6, 2023 and April 8, 2024;

    (iii)    Wellspring Solution billed GEICO purporting to provide Insureds with PCDs between April 10, 2024 and June 29, 2024;

      (iv)     Nexgen billed GEICO purporting to provide Insureds with PCDs between August 12, 2024 and September 7, 2024; and

      (v)     Platinum Line billed GEICO purporting to provide Insureds with PCDs between December 2, 2024 and January 11, 2025.

76.     Similarly, the DME Providers that only billed for TEJSDs operated in the following sequential manner:

      (i)     TM OS billed GEICO purporting to provide Insureds with TEJSDs between September 19, 2023 and November 17, 2023;

      (ii)     Vital Craft billed GEICO purporting to provide Insureds with TEJSDs between February 24, 2024 and March 11, 2024; and

      (iii)     Harmony OS billed GEICO purporting to provide Insureds with TEJSDs between July 16, 2024 and September 20, 2024.

77.     Similarly, and as part of the common scheme, based on the unlawful financial arrangements between the Secret Owner, the Paper Owner Defendants, and others who presently not identifiable but affiliated with the Clinics, the DME Providers each received virtually identical prescriptions for Fraudulent Equipment from multiple Referring Providers in the New York metropolitan area. For example:

      (i)     Harmony OS, Nexgen, TM OS, Vital Craft, Wellspring, Pinnacle, Luminex, BSD, and Platinum Line each received prescriptions for Fraudulent Equipment from Jean Pierre Barakat MD ("Dr. Barakat");

      (ii)     Harmony OS, Nexgen, TM OS, Vital Craft, Pinnacle, Luminex, BSD, and Platinum Line each received prescriptions for Fraudulent Equipment from John McGee DO ("Dr. McGee");

      (iii)     Harmony OS, Nexgen, Vital Craft, Wellspring, and Luminex each received prescriptions from Stella Amanze PA ("PA Amanze");

      (iv)     Harmony OS, Vital Craft, Wellspring, Pinnacle, and Luminex each received prescriptions from Nick Nicoloff MD ("Dr. Nicoloff"); and

      (v)     Nexgen, Wellspring, BSD, Luminex, and Platinum Line each received prescriptions from Rona Allen DC ("Dr. Allen").

78.     In addition, and as part of the common scheme, based on the unlawful financial

arrangements between the Secret Owner, the Paper Owner Defendants, and others who presently identifiable but who are affiliated with the Clinics, the DME Providers each received virtually identical prescriptions for Fraudulent Equipment from Clinics in the New York metropolitan area. For example:

(i)     Harmony OS, Nexgen, TM OS, Vital Craft, Wellspring, Pinnacle, and BSD each received prescriptions for Fraudulent Equipment from the Clinic located at 1568 Ralph Avenue, Brooklyn, NY (the "Ralph Avenue Clinic");

(ii)    Harmony OS, Nexgen, Vital Craft, Wellspring, Luminex, and Platinum Line each received prescriptions for Fraudulent Equipment from the Clinic located at 92-08 Liberty Avenue, Jamaica, NY (the "Liberty Avenue Clinic"); and

(iii)   TM OS, Vital Craft, Wellspring, and Platinum Line each received prescriptions for Fraudulent Equipment from the Clinic located at 718 Southern Boulevard, Bronx, NY (the "Southern Boulevard Clinic").

79.    Further, as part of Defendants' efforts to mask the Secret Owner's operation and control of the DME Providers, GEICO attempted to verify the claims submitted by Defendants by way of examinations under oath, but the Paper Owner Defendants intentionally refused to appear and provide testimony and/or documents because they would have been unable to answer key questions about the DME Providers' operations and their testimony would reveal the secret ownership scheme.

**B.    Overview of the Common Fraudulent Scheme**

80.    The Secret Owner, together with the Paper Owner Defendants, conceived and implemented a complex fraudulent scheme in which they used the DME Providers as vehicles to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits, which Defendants were never entitled to receive.

81.    To maximize the amount of no-fault benefits Defendants could receive, the Secret Owner along with the Paper Owner Defendants, used the DME Providers in sequential fashion,

and dispensed and billed for only one type of DME per provider, to divide the billing that they were submitting to no-fault insurance carriers, including GEICO.

82.    In keeping with the fact that Defendants split up their billing in order maximize the amount of no-fault benefits they could collect, each of the DME Providers who dispensed a particular type of DME operated in sequential order.

83.    Through the complex multi-corporation scheme, the Secret Owner and the Paper Owner Defendants used the DME Providers to bill and collect No-Fault Benefits from GEICO and other automobile insurers that they were never entitled to collect.  Specifically:

     (i)    Between June 2023 and December 2023, BSD submitted more than $833,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $75,000.00, and there is more than $710,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO;

     (ii)    Between November 2023 and April 2024, Luminex submitted more than $840,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $70,000.00, and there is more than $724,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO;

     (iii)    Between April 2024 and August 2024, Wellspring submitted more than $670,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $239,000.00, and there is more than $430,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO;

     (iv)    Between August 2024 and September 2024, Nexgen submitted more than $480,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $121,000.00, and there is more than $358,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO;

     (v)    Between February 2024 and August 2024, Vital Craft submitted more than $392,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $40,000.00, and there is more than $330,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO;

(vi)    Between September 2023 and the present, TM OS submitted more than $320,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $35,000.00, and there is more than $201,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO;

(vii)    Between July 2024 and the present, Harmony OS submitted more than $225,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $78,000.00, and there is more than $147,000.00 which has yet to be adjudicated but which Defendants continue to seek payment of from GEICO;

(viii)    Between August 2024 and the present, Pinnacle submitted more than $254,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $54,000.00, and there is more than $199,000.00 which has yet to be adjudicated but which Defendants continue to seek payment of from GEICO; and

(ix)    Between December 2024 and the present, Platinum Line submitted more than $1.23 million in fraudulent claims to GEICO, has wrongfully obtained more than $288,000.00, and there is more than $945,000.00 that has yet to be adjudicated but which Defendants continue to seek payment of from GEICO.

84.    The Defendants were able to perpetrate the fraudulent scheme against GEICO described below by obtaining prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers because of improper agreements with John Doe Defendants "2" through "10" associated with the Clinics who are not presently identifiable.

85.    As part of this scheme, Defendants obtained prescriptions for Fraudulent Equipment that were purportedly issued by various Referring Providers who purportedly treated Insureds at the various Clinics.

86.    Also as part of this scheme, Defendants obtained prescriptions for Fraudulent Equipment that were purportedly issued by Referring Providers during their treatment at a Clinic.

87.    None of Defendants marketed or advertised the DME Providers to the general public, and they lacked any genuine retail or office location, and operated without any legitimate

efforts to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

88.     Similarly, the Paper Owner Defendants did virtually nothing that would be expected of the owner of a legitimate DME supply company to develop its reputation in the medical community or to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

89.     Instead, Defendants entered illegal, collusive agreements with the Clinics, John Doe Defendants, and Referring Providers and steered them to prescribe and direct large volumes of the same prescriptions (or purported prescriptions) to the DME Providers for the specifically targeted Fraudulent Equipment.

90.     Defendants received the prescriptions for Fraudulent Equipment, purportedly issued by the Referring Providers as part of the unlawful financial arrangements with the John Doe Defendants, directly from the Clinics and without going through the Insureds. Many of these prescriptions were bogus and contained a duplicated signature of the Referring Provider who purportedly issued the prescription.

91.     As part of the scheme, and as a way to maximize the amount of money that Defendants could obtain from GEICO, and other automobile insurers, the prescriptions for PCDs that were purportedly issued by the Referring Providers and provided to Defendants were generic and vague.

92.     The Defendants used the intentionally generic and vague prescriptions to unlawfully choose one of many variations of PCDs that could be provided to the Insureds.  As a result, in virtually every circumstance available, Defendants purported to provide the Insureds with a variation that had high reimbursement rates under the applicable fee schedule.

93.     In addition to unlawfully choosing the specific type of Fraudulent PCDs to provide Insureds, Defendants submitted bills to GEICO seeking reimbursement for a specific type of Fraudulent PCD with a HCPCS Code that was not directly identified in the prescriptions.

94.     By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent PCDs based upon a specific HCPCS Code, the DME Defendants indicated that they provided Insureds with the particular items associated with the unique HCPCS Code, and that such specific item was medically necessary as determined by a healthcare provider licensed to prescribe DME.

95.     Specifically, Nexgen, Wellspring, Luminex, Platinum Line, and BSD (the "PCD Defendants") billed GEICO for the Fraudulent PCDs using HCPCS Code E0675, which represented that the PCD Defendants sold to Insureds pneumatic compression devices, described as "high pressure, rapid inflation/deflation cycle, for arterial insufficiency (unilateral and bilateral system)".

96.     Per CMS coding guidelines, this specific PCD is used to aid in the treatment of arterial insufficiency, which is for individuals with peripheral artery disease. By billing GEICO for PCDs using HCPCS Code E0675, the DME Providers represented to GEICO that the Insureds suffered from peripheral artery disease and needed the specific PCD that qualifies for E0675 to treat arterial insufficiency.

97.     Not surprisingly, the contemporaneous medical records do not indicate that the patients who received a Fraudulent PCD from the Supplier Defendants suffer from arterial insufficiency or peripheral artery disease.

98.     In fact, it is highly unlikely – to the point of impossibility – that all of the Insureds who received a Fraudulent PCD from the Supplier Defendants suffered from such diagnoses.

99.     After obtaining the vague and generic prescriptions for Fraudulent Equipment

purportedly issued by the Referring Providers as a result of paying various forms of consideration, Defendants would bill GEICO through the different DME Providers for: (i) Fraudulent Equipment that was not reasonable or medically necessary; (ii) Fraudulent Equipment that was not based on valid prescriptions from licensed healthcare providers; and (iii) Fraudulent Equipment that was otherwise not reimbursable.

100.    Furthermore, Nexgen often included assignment of benefits forms executed in the name of Wellspring with their billing submissions, calling into question whether Nexgen had a valid assignment in the first instance to permit them to seek reimbursement for the PCDs directly from no-fault insurers.

101.    Similarly, Platinum Line often included assignment of benefits forms executed in the name of Nexgen Line with their billing submissions, calling into question whether Platinum Line had a valid assignment in the first instance to permit them to seek reimbursement for the PCDs and/or osteogenesis stimulators directly from no-fault insurers.

102.    Additionally, as part of the scheme, and as a way to maximize the amount of money that Defendants could obtain from GEICO and other automobile insurers, Pinnacle virtually always purported to dispense osteogenesis stimulators in response to prescriptions for "Wearable PEMF Device".

**C.    Defendants' Failure to Comply with Local Licensing Provisions**

103.    As stated above, for a DME supplier to provide DME to automobile accident victims within the City of New York, the DME supplier must obtain a Dealer in Products License by the DCWP.

104.    For Defendants to lawfully provide DME to the Insureds identified in Exhibits "1" through "9", the DME Providers were required to obtain a Dealer in Products License because an

overwhelming majority of the Insureds identified in Exhibits "1" through "9" were located within the City of New York.

105.    As part of Defendants' scheme to defraud GEICO and other Insurers, Defendants sought Dealer in Products Licenses from the DCWP in an effort to have the DME Providers appear to be legitimate.

106.    However, the DME Providers were not eligible to collect No-Fault Benefits from GEICO, and other automobile insurers, because they were never lawfully licensed by the DCWP to provide DME to Insureds.

107.    For example, the DME Providers were not lawfully licensed by the DCWP because they obtained Dealer in Products licenses through fraud and/or misrepresentations.

108.    As part of obtaining a Dealer in Products License, each of the DME Providers, completed a license application form that required it to identify – among other things – all individuals who have more than a 10% ownership interest in the entity.

109.    Each Dealer in Products License application contains an affirmation to be signed with a penalty for false statements under Section 175.35 of New York's Penal Law.

110.    However, none of the applications for the Dealer in Products Licenses for the DME Providers identified the Secret Owner or the ownership interest of the Secret Owner.

111.    Instead, and in support of the fact that Defendants scheme to defraud GEICO and other automobile insurers of No-Fault Benefits, each of the applications falsely represented that the DME Providers were 100% owned by Paper Owner Defendants.

112.    In addition, the license application for a Dealer in Products License required the DME Providers to identify the commercial address of where each physically operated from.

113.    However, the Paper Owner Defendants each knowingly provided false information

in their Dealer in Products License applications relating to the operating addresses of the DME Providers.

114.     Specifically, the following Paper Owners each falsely affirmed as follows:

(i)     Harmony OS operated from 442 Lorimer Street, Suite D, Brooklyn, New York while knowing that it did not operate or conduct any business from that address;

(ii)     Nexgen Line operated from 238 Wilson Avenue, Suite A, Brooklyn, New York while knowing that it did not operate or conduct any business from that address;

(iii)     TM OS operated from 6704 Myrtle Avenue, Suite 1505, Glendale, New York while knowing that it did not operate or conduct any business from that address;

(iv)     Vital Craft operated from 477 Broadway, Floor 2, New York, New York, upon information and belief, while knowing that it did not operate or conduct any business from that address;

(v)     Wellspring operated from 276 5th Avenue, Room 704, New York, New York while knowing that it did not operate or conduct any business from that address;

(vi)     Pinnacle OS operated from 1178 Broadway, Floor 2, New York, New York while knowing that it did not operate or conduct any business from that address;

(vii)     BSD operated from 224 West 35th Street, Suite 587, New York, New York while knowing that it did not operate or conduct any business from that address;

(viii)     Luminex operated from 118-35 Queens Boulevard, Suite 400, Forest Hills, New York while knowing that it did not operate or conduct any business from that address; and

(ix)     Platinum Line operated from 175-61 Hillside Avenue, Suite 202, Jamaica, New York while knowing that it did not operate or conduct any business from that address.

115.     In support of the fact that the Dealer in Products license application for Harmony OS contained false affirmations, 442 Lorimer Street, Suite D, Brooklyn, New York is the location of an "Office 11206".

116. In support of the fact that the Dealer in Products license applications for Nexgen Line contained false affirmations, 238 Wilson Avenue, Suite A, Brooklyn, New York is the location of a "Post Net".

117. In support of the fact that the Dealer in Products license applications for TM OS contained false affirmations, 6704 Myrtle Avenue, Suite 1505, Glendale, New York is the location of a "Qwik Pack & Ship of Queens".

118. In support of the fact that the Dealer in Products license applications for Vital Craft, Pinnacle OS, and Wellspring contained false affirmations, 1178 Broadway, Floor 2, New York, New York, 276 5th Avenue, Room 704, New York, New York, and 477 Broadway, Floor 2, New York, New York are the sites of business centers providing virtual and short-term office rental space.

119. In support of the fact that the Dealer in Products license applications for BSD Luminex, and Platinum line contained false affirmations, BSD, Luminex, and Platinum Line did not operate from 224 West 35th Street, Suite 587, New York, New York, 118-35 Queens Boulevard, Suite 400, Forest Hills, New York, and/or 175-61 Hillside Avenue, Suite 202, Jamaica New York, their purported operating addresses.

120. The Paper Owners knowingly provided false information regarding their business addresses and ownership to induce the DCWP to issue licenses to them, which would give Defendants the appearance of legitimacy and provide them with the opportunity to submit fraudulent billing to GEICO and other Insurers through the DME Providers.

121. Accordingly, Defendants were never entitled to receive No-Fault Benefits because they failed to comply with all significant statutory and regulatory requirements by operating as a DME supplier within the City of New York without a valid Dealer in Products License.

122.    In each of the claims identified in Exhibits "1" through "9" Defendants fraudulently misrepresented that they were properly licensed with all local statutory and regulatory requirements and were lawfully permitted to provide DME to Insureds when Defendants were never eligible to collect No-Fault Benefits in the first instance because the DME Suppliers did not lawfully obtain Dealer in Products Licenses by receiving their Dealer in Products licenses under the false pretenses described above.

**D.    The Defendants' Unlawful Financial Arrangements**

123.    To obtain access to Insureds as part of their fraudulent scheme and to maximize the No-Fault Benefits Defendants could obtain from GEICO and other New York automobile insurers, Defendants entered into unlawful financial agreements with the John Doe Defendants who are not presently identifiable but who are associated with the Clinics where prescriptions for Fraudulent Equipment were provided to Defendants in exchange for financial consideration.

124.    Since the inception of Defendants' fraudulent scheme, Defendants engaged in unlawful financial arrangements with the John Doe Defendants to obtain prescriptions for Fraudulent Equipment. These schemes allowed Defendants to submit thousands of claims for Fraudulent Equipment to GEICO and other New York automobile insurers in New York.

125.    As part of the unlawful financial arrangements, Defendants would pay others who are not presently identifiable, including fictitious businesses, to obtain prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers at the Clinics.

126.    The Defendants were able to enter unlawful financial arrangement schemes with the John Doe Defendants in order to obtain prescriptions purportedly issued by the Referring Providers because the Referring Providers operated at Clinics that are actually organized as "one-stop" shops for no-fault insurance fraud.

127.    These Clinics provide facilities for the Referring Providers, as well as a "revolving door" of medical professional corporations, all geared towards exploiting New York's no-fault insurance system.

128.    In fact, GEICO has received billing from an ever-changing number of fraudulent healthcare providers at a variety of different Clinics that were the sources of the prescriptions for Defendants, which start and stop operations without any purchase or sale of a "practice", without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

129.    For example, one of the Clinics where Defendants obtained prescriptions from was the Ralph Avenue Clinic, which is a Clinic with a "revolving door" of numerous healthcare providers. In fact, GEICO has received billing from eighty (80) different healthcare providers at the Ralph Avenue Clinic.

130.    The Defendants also obtained prescriptions from the Liberty Avenue Clinic, 1611 East New York Avenue, Brooklyn (the "East New York Avenue Clinic") and 1339 East Gun Hill Road, Bronx (the "Gun Hill Road Clinic"), each of which are Clinics with a "revolving door" of more than seventy (70) different health care providers that billed GEICO.

131.    Pursuant to the unlawful financial arrangements, Defendants paid the John Doe Defendants who are associated with the Clinics, and who were able to direct prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers to Defendants, which Defendants used as a basis to support their fraudulent bills to GEICO.

132.    In support of the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements, and as explained in detail below, the prescriptions were not

medically necessary, were provided pursuant to predetermined fraudulent protocols that provided Insureds with predetermined sets of virtually identical Fraudulent Equipment, and frequently never actually issued by the Referring Provider.

133.    In keeping with the fact that Defendants obtained prescriptions for Fraudulent Equipment which were not medically unnecessary and were provided pursuant to predetermined fraudulent protocols, Defendants: (i) received virtually identical predetermined sets of prescriptions for each insured who treated at a particular Clinic; (ii) Referring Providers who treated at multiple clinics typically issued prescriptions for predetermined sets of DME that varied depending on the clinic at which the Referring Provider was treating, and (iii) obtained prescriptions for Fraudulent Equipment directly from the Clinics without any communication with or involvement by the Insureds.

134.    In keeping with the fact that Defendants obtained prescriptions for Fraudulent Equipment that were never actually issued by the Referring Provider, as described in more detail below, at times the DME Providers submitted bills to GEICO based upon prescriptions for Fraudulent Equipment that: (i) contained a photocopied signature Referring Provider; (ii) were undated; and/or (iii) were issued on a date that the Insured was not treated by the Referring Provider who purportedly issued the prescription.

135.    In all of the claims identified in Exhibits "1" through "9", Defendants falsely represented that Fraudulent Equipment was provided pursuant to lawful prescriptions from healthcare providers and were therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions were provided pursuant to unlawful financial arrangements.

    **E.    The Prescriptions Obtained Pursuant to Predetermined Fraudulent Protocols**

136.    In addition to Defendants' unlawful financial arrangements, pursuant to agreements

with others who are not presently identifiable, Defendants obtained prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers but where issued pursuant to predetermined fraudulent protocols, which were designed to maximize the billing that Defendants – and others – could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds.

137.    In the claims identified in Exhibits "1" through "9", virtually all of the Insureds were involved in relatively minor and low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

138.    Accordingly, almost none of the Insureds identified in Exhibits "1" through "9", whom the Referring Providers purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

139.    In keeping with the fact that the Insureds identified in Exhibits "1" through "9" suffered only minor injuries – to the extent that they had any injuries at all – as a result of the relatively minor accidently, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

140.    To the extent that the Insureds in the claims identified in Exhibits "1" through "9" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and then sent on their way with nothing more serious than a minor soft tissue injury such as a sprain or strain.

141.    However, despite virtually all the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds who treated with each of the Referring Providers at a particular clinic were subject to extremely similar treatment including nearly

34

identical prescriptions for Fraudulent Equipment.

142.    The prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibits "1" through "9" were issued pursuant to predetermined fraudulent protocols set forth at each Clinic, not because the Fraudulent Equipment was medically necessary for each Insured based upon his or her individual symptoms or presentations.

143.    For example, virtually all of the Insureds were prescribed a PCD, TEJSD, and/or "Wearable PEMF Device" after their low-speed and low-impact motor vehicle accidents when such DME are – in a legitimate setting – only provided after appropriate consideration for a specific, documented, and corelated condition to patients.

144.    The prescriptions for Fraudulent PCDs that were purportedly issued to the Insureds identified in Exhibits "1" through "4" and "9" were issued pursuant to predetermined fraudulent protocols set forth at each Clinic, and not because the Fraudulent PCDs were medically necessary for each Insured based upon his or her individual symptoms or presentations.

145.    For example, virtually all of the Insureds were prescribed the Fraudulent PCDs after their low-speed and low-impact motor vehicle accidents, when such devices are – in a legitimate setting – only provided after appropriate consideration for a specific, documented, and corelated condition to patients.

146.    A PCD is a machine that stimulates muscle action in the extremities to encourage blood circulation, with the goal of preventing the formation of blood clots in veins and arteries ("deep vein thrombosis" or "DVT") that can block the flow of blood to vital organs such as the lungs, brain, and heart. In a legitimate setting, there are only a limited number of circumstances where PCDs are medically necessary.

147.    Circumstances where PCDs could be medically necessary include following major

35

surgical procedures in an inpatient hospital setting when a patient is immobile or is otherwise at risk of DVT.

148.    Per CMS coding guidelines, the specific PCDs for which Defendants sought reimbursement from GEICO are used to aid in the treatment of arterial insufficiency, which is for individuals with peripheral artery disease.

149.    By extension, by billing GEICO for PCDs using HCPCS Code E0675, the Supplier Defendants represented to GEICO that the Insureds suffered from peripheral artery disease and needed the specific PCD that qualifies for E0675 to treat arterial insufficiency.

150.    In keeping with the fact that the PCDs prescribed to the Insureds identified in Exhibits "1" through "4" and "9" were not medically necessary and were provided pursuant to predetermined fraudulent protocols, virtually none, if any, of the medical records completed contemporaneous to the issuance of the prescription for the Fraudulent PCDs indicated the Insureds had peripheral artery disease.

151.    Similar to the prescriptions for Fraudulent PCDs, the prescriptions for Fraudulent TEJSDs identified in Exhibits "5" through "7" were issued pursuant to predetermined fraudulent protocols set forth at each Clinic, and not because the Fraudulent TEJSDs were medically necessary for each Insured based upon his or her individual symptoms or presentations.

152.    TEJSDs are noninvasive devices that purportedly deliver electrical stimulation intended to reduce the level of pain and symptoms associated with arthritis in a joint.

153.    By billing GEICO for TEJSDs, the Supplier Defendants represented to GEICO that the Insureds suffered from joint arthritis and needed the specific TEJSDs that qualifies for E0762 to treat the Insureds' arthritis.

154.    However, in keeping with the fact that the TEJSDs prescribed to the Insureds

identified in Exhibits "5" through "7" were not medically necessary and were provided pursuant to predetermined fraudulent protocols, virtually none, if any, of the medical records completed contemporaneous to the issuance of the prescription for the Fraudulent TEJSDs indicated whether a TEJSD was issued for the treatment of arthritic pain or whether the Insured's arthritic pain was causally related to their automobile accident.

155.    Notably only one item is approved by Noridian to be billed under HCPCS E0762.

156.    Upon information and belief, despite billing for providing TEJSDs under HCPCS Code E0762, Defendants never provided Insureds with a TEJSD because they did not dispense the only item approved by Noridian to be billed under HCPCS E0762.

157.    Instead, to the extent that Defendants provided Insureds with any DME in response to prescriptions for TEJSDs, Defendants provided cheap DME to the Insureds that had a reimbursement rate of a fraction of the billed for TEJSDs.

158.    As another example, as set forth in Exhibits "8" and "9", many of the Insureds were prescribed "wearable PEMF" devices, that were billed by Pinnacle or Platinum Line as osteogenesis stimulators, which is also known as a bone growth stimulation device.

159.    Pinnacle and Platinum Line obtained the prescriptions for "wearable PEMF" devices as a result of predetermined fraudulent protocols, not because the osteogenesis stimulators were medically necessary for each Insured.

160.    In other instances, Pinnacle dispensed an osteogenesis stimulator without having received a prescription whatsoever.

161.    Osteogenesis stimulators are devices used to encourage bone growth and help heal broken bones.  Various commercial insurers have issued policy bulletins that make clear that the use of an osteogenesis stimulator is only necessary to heal bone fractures under limited

circumstances, while CMS has published guidance stating that electrical osteogenesis stimulators billed under E0747 are covered only if there is evidence of a fracture where healing has ceased for three or more months prior to starting treatment with the osteogenesis stimulator.

162.    However, in a legitimate setting osteogenesis stimulators are not utilized to provide treatment to typical motor vehicle accident patients. Even more, there is no scientific evidence that bone stimulators, like the ones purportedly provided by Defendants, help treat patients with musculoskeletal injuries.

163.    However, billing for osteogenesis stimulators were effective in furthering Defendants fraudulent scheme because they could acquire cheap, portable stimulation devices at low cost and submit false claims for reimbursement to GEICO, which has a reimbursable rate of $3,300.00 in the Fee Schedule.

164.    No legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit prescriptions for any of the Fraudulent Equipment to be issued based upon the fraudulent protocols described below.

165.    In general, Defendants obtained prescriptions for medically unnecessary Fraudulent Equipment purportedly issued by the Referring Providers pursuant to the following predetermined fraudulent protocols:

(i)     an Insured would arrive at a Clinic for treatment subsequent to a motor vehicle accident;

(ii)    the Insured would be seen by a Referring Provider;

(iii)   on the date of the first visit, the Referring Provider would direct the Insured to undergo conservative treatment and purportedly provide a prescription for a set of DME;

(iv)    subsequently, the Insured would return to the Clinic for one or more additional evaluations and treatment by other healthcare providers, and would at times be provided with at least one additional prescription for a predetermined set of DME, although the Referring Provider did not always

treat the Insured on the date of the additional prescription for DME; and

(v)    at least one, if not more than one, prescription for DME would be directly provided to Defendants to fill and was without any involvement by the Insured.

166.    Virtually all of the claims identified in Exhibits "1" through "9" are based upon medically unnecessary prescriptions for predetermined sets of Fraudulent Equipment, which were purportedly issued by the Referring Providers who practiced at various Clinics across the New York metropolitan area.

167.    In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct a specific course of treatment based upon the patients' individual symptoms or presentation.

168.    Furthermore, in a legitimate setting, during a patient's treatment, a healthcare provider may – but generally does not – prescribe DME that may aid in the treatment of the patient's symptoms.

169.    In determining whether to prescribe DME to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME. In all circumstances, any prescribed DME would always directly relate to each patient's individual symptoms or presentation.

170.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in an automobile accident.

171.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual

is injured in a given automobile accident.

172.    If a healthcare provider determines that DME is medically necessary after considering a patient's individual circumstances and situations, in a legitimate setting, the healthcare provider would indicate in a contemporaneous medical record, such as an evaluation report, what specific DME was prescribed, why it was medically necessary, or how it would help the Insureds.

173.    Further, in a legitimate setting, when a patient returns for an examination after being prescribed DME, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME or newly issued DME.

174.    It is improbable – to the point of impossibility – that virtually all of the Insureds identified in Exhibits "1" through "9" who treated at a specific Clinic or with a specific Referring Provider would receive virtually identical prescriptions for Fraudulent Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

175.    Here, and in keeping with the fact that the prescriptions provided to Defendants were for medically unnecessary Fraudulent Equipment obtained as part of predetermined fraudulent protocols, virtually all of the Insureds identified in Exhibits "1" through "9" that treated at a specific Clinic or with a specific Referring Provider were issued virtually identical prescriptions for a predetermined set of Fraudulent Equipment.

176.    While the specific preset prescriptions of Fraudulent Equipment varied based upon the specific Clinic that the Insured visited, or the Referring Provider with whom they treated, there were multiple items of Fraudulent Equipment that were purportedly prescribed to virtually all the

Insureds identified in Exhibits "1" through "9" regardless which Clinic the insureds visited.

177.    In also in keeping with the fact that the prescriptions for Fraudulent Equipment used by Defendants were medically unnecessary and obtained as part of a predetermined fraudulent protocol, many of the prescriptions were purportedly issued by the Referring Providers on dates that the Insureds never even treated with the Referring Providers.

178.    Also, and in further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibits "1" through "9" were issued pursuant to predetermined fraudulent protocols and not for the benefit of the Insureds, as set forth below, the Referring Providers issued similar checkmark-based prescriptions and routinely issued multiple checkmark-based prescriptions to a single patient on the same day when there was no legitimate reason to do so.

179.    The multiple checkmark-based prescriptions issued by the Referring Providers to an Insured on the same date was part of a predetermined fraudulent protocol that was designed to allow Defendants to submit multiple bills to GEICO for Fraudulent Equipment in an effort to artificially lower the total dollar amount submitted on each bill and avoid detection.

180.    Alternatively, the Referring Providers issued a single checkmark-based prescription prescribing multiple items of DME to a single insured which was then divided between the DME Defendants, resulting in, for example, Nexgen billing for a PCD, Pinnacle billing for an osteogenesis stimulator, and Harmony OS billing for a TEJSD.

181.    In further keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, to the extent that there was a contemporaneously dated evaluation report, the evaluation report virtually always failed to explain – and oftentimes failed to identify – the Fraudulent Equipment

identified on the prescriptions provided to Defendants and used by Defendants to bill GEICO for the charges identified in Exhibits "1" through "9".

182.    In also keeping with the fact that the prescriptions for Fraudulent Equipment purportedly issued to the Insureds identified in Exhibits "1" through "9" were not medically necessary but were the result of a predetermined fraudulent protocol, the prescriptions often contained vague and generic descriptions for DME, which – as explained in more detail below – provided Defendants with the opportunity to purportedly provide – and bill GEICO for – whatever DME they wanted.

183.    In further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibits "1" - "9" were issued because of predetermined fraudulent protocols and not based upon medical necessity, many of the prescriptions identified in Exhibits "1" - "9" were not actually issued by the Referring Provider listed on the prescription. Instead, in those circumstances, the prescriptions were issued by others who are not presently identifiable, without the Referring Providers issuing, signing, authorizing, or even knowing about such prescriptions.

184.    To that end, and in support of the fact that the prescriptions for Fraudulent Equipment used by Defendants to support the charges identified in Exhibits "1" though "8" were medically unnecessary and obtained as part of a predetermined fraudulent protocol, many of the prescriptions that were purportedly issued by Referring Providers contained a photocopied or forged signature of the Referring Providers.

185.    For example:

     i.    On September 5, 2024, Dr. Barakat purportedly prescribed Fraudulent Equipment – including a PCD, TEJSD, "Neuromuscular stimulator, electronic shock unit device", "Non-thermal pulsed high frequency radiowaves, high peak power electromagnetic energy device", and "Equipo Medico Infrared Heat Pad with Low Level Light Therapy" – to an Insured named CB. Pursuant to Dr. Barakat's prescription, Defendants submitted charges to GEICO through

Nexgen and Harmony OS totaling more than $3,634.95. The prescription originated from the Ralph Avenue Clinic and contained the following photocopied and/or stamped signature:



ii. On September 26, 2023, Dr. Barakat purportedly prescribed Fraudulent Equipment – including a PCD and TEJSD – to an Insured named AM. Pursuant to Dr. Barakat's prescription, Defendants submitted charges to GEICO through BSD and TM OS totaling more than $3,634.95. The prescription originated from the Ralph Avenue Clinic and contained the following photocopied and/or stamped signature:



iii. On August 12, 2024, Dr. Barakat purportedly prescribed Fraudulent Equipment – including a PCD, TEJSD, "Neuromuscular stimulator, electronic shock unit device", "Non-thermal pulsed high frequency radiowaves, high peak power electromagnetic energy device", and "Equipo Medico Infrared Heat Pad with Low Level Light Therapy" – to an Insured named SR. Pursuant to Dr. Barakat's prescription, Defendants submitted charges to GEICO through Nexgen and Harmony OS totaling more than $3,634.95. The prescription originated from the Ralph Avenue Clinic and contained the following photocopied and/or stamped signature:



iv. On December 5, 2024, Dr. Barakat purportedly prescribed Fraudulent Equipment – including a PCD, TEJSD, "Neuromuscular stimulator, electronic shock unit device", "Non-thermal pulsed high frequency radiowaves, high peak power electromagnetic energy device", and "Equipo Medico Infrared Heat Pad with Low Level Light Therapy" – to an Insured named CH. Pursuant to Dr. Barakat's prescription, Defendants submitted charges to GEICO through Platinum Line, totaling $2,826.70. The prescription originated from the Ralph Avenue Clinic and contained the following photocopied and/or stamped signature:



v. On October 19, 2023, John McGee DO ("Dr. McGee") purportedly prescribed

Fraudulent Equipment – including a PCD, "Wearable PEMF Device" and TEJSD – to an Insured named KQ. Pursuant to Dr. McGee's prescription, Defendants submitted charges to GEICO through BSD and TM OS totaling $3,635.20. The prescription originated from the East Gun Hill Road Clinic and contained the following photocopied and/or stamped signature:

Physician's Signature _____

Date: 10/19/23

vi.     On October 19, 2023 Dr. McGee purportedly prescribed Fraudulent Equipment – including a PCD, "Wearable PEMF Device" and TEJSD – to an Insured named AL. Pursuant to Dr. McGee's prescription, Defendants submitted charges to GEICO through BSD and TM OS totaling $3,635.20. The prescription originated from the East Gun Hill Road Clinic and contained the following photocopied and/or stamped signature:

Physician's Signature _____

Date 10/19/23

vii.    On November 2, 2023 Dr. McGee purportedly prescribed Fraudulent Equipment – including a PCD, "Wearable PEMF Device" and TEJSD – to an Insured named WM. Pursuant to Dr. McGee's prescription, Defendants submitted charges to GEICO through Luminex and TM OS totaling $3,635.20. The prescription originated from the East Gun Hill Road Clinic and contained the following photocopied and/or stamped signature:

Physician's Signature _____

Date: 11/02/23

viii.   On November 2, 2023 Dr. McGee purportedly prescribed Fraudulent Equipment – including a PCD, "Wearable PEMF Device" and TEJSD – to an Insured named LGB. Pursuant to Dr. McGee's prescription, Defendants submitted charges to GEICO through Luminex and TM OS totaling $3,635.20. The prescription originated from the East Gun Hill Road Clinic and contained the following photocopied and/or stamped signature:

Physician's Signature _____

Date: 11/02/23

ix.     On November 12, 2024 Dr. McGee purportedly prescribed Fraudulent Equipment – including a PCD, "Wearable PEMF Device" and TEJSD – to an Insured named RGJ. Pursuant to Dr. McGee's prescription, Defendants submitted charges to GEICO through Harmony OS and Platinum Line totaling $3,634.95. The prescription originated from a No-Fault Clinic located at 941

Burke Avenue, Bronx, New York (the "Burke Avenue Clinic") and contained the following photocopied and/or stamped signature:

Physician's Signature _____  Date: 11/12/24

x.     On June 27, 2023, Jeremie Rachunow MD ("Dr. Rachunow") purportedly prescribed Fraudulent Equipment – including a PCD – to an insured named JB. Pursuant to Dr. Rachunow's prescription, Defendants submitted charges to GEICO through BSD totaling $2,826.70. There is no evidence JB treated with Dr. Rachunow on June 27, 2023. The prescription originated from a No-Fault Clinic located at 2422 Knapp Street, Brooklyn, New York (the "Knapp Street Clinic") and contained the following photocopied and/or stamped signature:

Physician's Signature _____  Date: 06/27/2023

xi.     On June 27, 2023, Dr. Rachunow purportedly prescribed Fraudulent Equipment – including a PCD – to an insured named JC. Pursuant to Dr. Rachunow's prescription, Defendants submitted charges to GEICO through BSD totaling $2,826.70. There is no evidence JC treated with Dr. Rachunow on June 27, 2023. The prescription originated from the Knapp Street Clinic and contained the following photocopied and/or stamped signature:

Physician's Signature _____  Date: 06/27/2023

xii.     On June 27, 2023, Dr. Rachunow purportedly prescribed Fraudulent Equipment – including a PCD – to an insured named OT. Pursuant to Dr. Rachunow's prescription, Defendants submitted charges to GEICO through BSD totaling $2,826.70. There is no evidence OT treated with Dr. Rachunow on June 27, 2023. The prescription originated from at the Knapp Street Clinic and contained the following photocopied and/or stamped signature:

Physician's Signature _____  Date: 06/27/2023

xiii.     On June 27, 2023, Dr. Rachunow purportedly prescribed Fraudulent Equipment – including a PCD – to an insured named RE. Pursuant to Dr. Rachunow's prescription, Defendants submitted charges to GEICO through BSD totaling $2,826.70. There is no evidence RE treated with Dr. Rachunow on June 27, 2023. The prescription originated from the Knapp Street Clinic and contained the following photocopied and/or stamped signature:

Physician's Signature _____

Date: 06/27/2023

xiv.     On June 27, 2023, Dr. Rachunow purportedly prescribed Fraudulent Equipment – including a PCD – to an insured named HT. Pursuant to Dr. Rachunow's prescription, Defendants submitted charges to GEICO through BSD totaling $2,826.70. There is no evidence HT treated with Dr. Rachunow on June 27, 2023. The prescription originated from the Knapp Street Clinic and contained the following photocopied and/or stamped signature:

Physician's Signature _____

Date: 06/27/2023

xv.      On June 21, 2023 Wei Hong Xu, NP ("NP Xu") purportedly prescribed Fraudulent Equipment – including a PCD and "Wearable PEMF Device" – to an insured named JCR. Pursuant to NP Xu's prescription, Defendants submitted charges to GEICO through BSD totaling $2,826.70. There is no evidence JCR treated with NP Xu on June 21, 2023. The prescription originated from a No-Fault Clinic located at 486 McDonald Avenue, Brooklyn, New York (the "McDonald Avenue Clinic"), erroneously identifies NP Xu as "Dr. Wei Hong Xu" at the top of the prescription, and contained the following photocopied and/or stamped signature:

Physician's Signature _____

Date: 06/21/23

xvi.     On June 21, 2023 NP Xu purportedly prescribed Fraudulent Equipment – including a PCD and "Wearable PEMF Device" – to an insured named FV. Pursuant to NP Xu's prescription, Defendants submitted charges to GEICO through BSD totaling $2,826.70. There is no evidence FV treated with NP Xu on June 21, 2023. The prescription originated from the McDonald Avenue Clinic, erroneously identifies NP Xu as "Dr. Wei Hong Xu" at the top of the prescription, and contained the following photocopied and/or stamped signature:

Physician's Signature _____

Date: 06/21/23

xvii.    On June 21, 2023 NP Xu purportedly prescribed Fraudulent Equipment – including a PCD and "Wearable PEMF Device" – to an insured named DMD. Pursuant to NP Xu's prescription, Defendants submitted charges to GEICO through BSD totaling $2,826.70. There is no evidence DMD treated with NP Xu on June 21, 2023. The prescription originated from the McDonald Avenue Clinic, erroneously identifies NP Xu as "Dr. Wei Hong Xu" at the top of the prescription, and contained the following photocopied and/or stamped

signature:

Physician's Signature _____ Date: 06/21/23

xviii. On June 21, 2023 NP Xu purportedly prescribed Fraudulent Equipment – including a PCD and "Wearable PEMF Device" – to an insured named GA. Pursuant to NP Xu's prescription, Defendants submitted charges to GEICO through BSD totaling $2,826.70. There is no evidence GA treated with NP Xu on June 21, 2023. The prescription originated from the McDonald Avenue Clinic, erroneously identifies NP Xu as "Dr. Wei Hong Xu" at the top of the prescription, and contained the following photocopied and/or stamped signature:

Physician's Signature _____ Date: 06/21/23

xix. On June 21, 2023 NP Xu purportedly prescribed Fraudulent Equipment – including a PCD and "Wearable PEMF Device" – to an insured named TN. Pursuant to NP Xu's prescription, Defendants submitted charges to GEICO through BSD totaling $2,826.70. There is no evidence TN treated with NP Xu on June 21, 2023. The prescription originated from the McDonald Avenue Clinic, erroneously identifies NP Xu as "Dr. Wei Hong Xu" at the top of the prescription, and contained the following photocopied and/or stamped signature:

Physician's Signature _____ Date: 06/21/23

xx. On January 29, 2024 Yledede Cummings NP ("NP Cummings") purportedly prescribed Fraudulent Equipment – including an orthopedic car seat and a TEJSD– to an insured named AT. Pursuant to NP Cummings' prescription, Defendants submitted charges to GEICO through Vital Craft totaling $808.25. The prescription originated from a No Fault Clinic located at 1 Cross Island Plaza, Rosedale, NY (the "Cross Island Plaza Clinic"), and contained the following photocopied and/or stamped signature:



Physician's Signature _____ Date: 01/29/24

xxi. On September 4, 2024 NP Cummings purportedly prescribed Fraudulent Equipment – including a PCD and "Wearable PEMF Device" – to an insured named KF. Pursuant to NP Cummings' prescription, Defendants submitted charges to GEICO through Platinum Line totaling $2,826.70. The prescription originated from the Cross Island Plaza Clinic, and contained the following photocopied and/or stamped signature:

Physician's Signature _____

Date: 9/4/24

xxii.    On November 30, 2023 NP Cummings purportedly prescribed Fraudulent Equipment – including an orthopedic car seat and a TEJSD– to an insured named SB. Pursuant to NP Cummings' prescription, Defendants submitted charges to GEICO through Vital Craft totaling $808.25. The prescription originated from the Cross Island Plaza Clinic, and contained the following photocopied and/or stamped signature:

Physician's Signature _____

Date: 11/30/23

xxiii.    On January 11, 2024 NP Cummings purportedly prescribed Fraudulent Equipment – including an orthopedic car seat and a TEJSD– to an insured named TF. Pursuant to NP Cummings' prescription, Defendants submitted charges to GEICO through Vital Craft totaling $808.25. The prescription originated from the Cross Island Plaza Clinic, and contained the following photocopied and/or stamped signature:

Physician's Signature _____

Date: 01/11/24

xxiv.    On November 2, 2023 Nick Nicoloff MD ("Dr. Nicoloff") purportedly issued at least two prescriptions for Fraudulent Equipment – including a TEJSD and a PCD –to an insured named AK. Pursuant to Dr. Nicoloff's prescriptions, Defendants submitted charges to GEICO through Luminex and TM OS totaling $3,634.95. The prescriptions originated from a No-Fault Clinic located at 5506 Avenue N, Brooklyn, New York (the "Avenue N Clinic"), and contained the following photocopied and/or stamped signature:

*Prescription 1*

Physician's Signature _____

Date: 11/2/23

*Prescription 2*

Physician's Signature _____

Date: 11/2/23

xxv.    On January 11, 2024 Dr. Nicoloff purportedly issued at least one prescription for Fraudulent Equipment – including a TEJSD– to an insured named RB.

Pursuant to Dr. Nicoloff's prescriptions, Defendants submitted charges to GEICO through Vital Craft totaling $808.25. The prescription originated from the Avenue N Clinic, and contained the following photocopied and/or stamped signature:

Physician's Signature _____ Date: 1/11/24

186.    In further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibits "1" through "9" were issued because of predetermined fraudulent protocols and not based upon medical necessity, the prescriptions purportedly issued by the Referring Providers were never given to the Insureds.

187.    Instead, the Insureds were often provided with Fraudulent Equipment directly from the Clinic's receptionists, without any interaction from Defendants – to the extent that the Insureds actually received any Fraudulent Equipment – and the prescriptions were routed directly to Defendants from the Clinics.

188.    For the reasons set forth above, and below, in each of the claims identified  in Exhibits "1" through "9", Defendants falsely represented that Fraudulent Equipment was provided pursuant to prescriptions from healthcare providers for medically necessary DME, and were therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions were for medically unnecessary Fraudulent Equipment issued pursuant to predetermined fraudulent protocols and provided to Defendants pursuant agreements with others who are not presently identifiable.

i.    **The Predetermined Fraudulent Protocol involving Barakat**

189.    Barakat, as part of Medical Care of Queensborough PC ("Medical Care of Queensborough"), either directly or with the assistance of third-party individuals not presently

known, agreed to participate in a predetermined fraudulent protocol as a result of an unlawful financial arrangement with Defendants where Barakat provided Insureds with prescriptions for Fraudulent Equipment.

190.    After their involvement in minor "fender-bender" motor vehicle accidents, many of the Insureds who purportedly received Fraudulent Equipment from Nexgen, Pinnacle, Harmony OS, BSD, TM OS, Luminex, Wellspring, Platinum Line, and/or Vital Craft OS and identified in Exhibits "1" through "9" purportedly received treatment from Barakat at the Ralph Ave Clinic, the Liberty Ave Clinic, or the Southern Boulevard Clinic.

191.    Dr. Barakat is no stranger to fraudulent schemes. He has been named as a defendant in multiple lawsuits within the Eastern District of New York alleging, variously, that he served as the nominal owner of medical practices used by laypersons to bill GEICO for a variety of fraudulent services, and that he issued prescriptions for pharmaceuticals in exchange for kickbacks. See Gov't Emps. Ins. Co. v. Gelb et al., 1:23-cv-05250(ENV)(RML), Gov't Emps. Ins. Co. v. Barakat et al., 1:22-cv-07532(NGG)(RML), Gov't Emps. Ins. Co. v. Direct Rx Pharmacy Inc. et al., 1:19-cv-05876(DG)(LB), Allstate Ins. Co. et al. v. New Century Pharmacy Inc. et al., 1:19-cv-05702(ENV)(VMS).

192.    When the Insureds sought treatment with and were purportedly provided with an initial and/or follow up evaluation by Dr. Barakat, Dr. Barakat did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME to provide.

193.    Rather, Dr. Barakat purportedly issued prescriptions for a predetermined set of Fraudulent Equipment to each Insured after a purported examination based upon a predetermined fraudulent protocol.

194.    In keeping with the fact that the prescriptions issued to the Insureds by Dr. Barakat

at the Ralph Ave Clinic, the Liberty Ave Clinic, and the Southern Boulevard Clinic after purported examinations were not medically necessary and were issued pursuant to predetermined fraudulent protocols, Dr. Barakat never evaluated each Insured's individual symptoms or presentation to determine whether and what type of DME would aid in each Insured's treatment.

195.    Instead, and in keeping with the fact that the prescriptions issued to the Insureds after their examinations were not medically necessary and were issued pursuant to predetermined fraudulent protocols, virtually every Insured who underwent an examination with Barakat examination at the Ralph Ave Clinic, the Liberty Ave Clinic, or the Southern Boulevard Clinic received a prescription for virtually the same type of Fraudulent Equipment.

196.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, after a purported examination at the Ralph Ave Clinic, the Liberty Ave Clinic, or the Southern Boulevard Clinic, Dr. Barakat virtually always prescribed either (i) PCD, TEJSD, "Neuromuscular stimulator, electronic shock unit device", "Non-thermal pulsed high frequency radiowaves high peak power electromagnetic energy device", and "Equipo Medico Infrared Heat Pad with Low Level Light Therapy"; or (ii) PCD, TEJSD, and, at times, "wearable PEMF Device".

197.    In also keeping with the fact that the prescriptions for Fraudulent Equipment issued by Barakat at the Ralph Ave Clinic, the Liberty Ave Clinic, and the Southern Boulevard Clinic were fraudulently issued by unidentifiable third-party individuals and not Dr. Barakat himself, virtually all of the Insureds identified in Exhibits "1" through "9" received a single prescription for all of the above identified DME which was then divided among the DME Defendants and others.

198.    Upon information and belief, a single prescription issued to Insureds on a single date were divided among Defendants as part of the scheme between Defendants and unidentifiable third-party individuals to provide Defendants with the ability to submit separate bills to GEICO for reimbursement of No-Fault Benefits in a way to lower the amount charged to GEICO on each bill so Defendants could avoid detection of their fraudulent schemes.

199.    There is no legitimate reason why a single prescription would be split among multiple DME companies. Moreover, there is no legitimate reason why this would occur in virtually all of the Insureds identified in Exhibits "1" through "9" who treated at the Ralph Ave Clinic, the Liberty Ave Clinic, and the Southern Boulevard Clinic.

200.    Even more, the predetermined fraudulent protocols established at the Ralph Ave Clinic, the Liberty Ave Clinic, and the Southern Boulevard Clinic where Insureds were provided with multiple prescriptions for virtually identical Fraudulent Equipment were not isolated to prescriptions provided to Defendants. At times, the prescriptions for the Insureds identified in Exhibits "1" through "9" were provided to DME Defendants Nexgen, Pinnacle, Harmony OS, BSD, TM OS, Luminex, Wellspring, Platinum Line, and/or Vital Craft OS *and* to other DME suppliers.

201.    For example:

(i)    On May 20, 2024 an Insured named JD was purportedly involved in a motor vehicle accident. JD purportedly started treating at the Liberty Avenue Clinic with Dr. Barakat on June 3, 2024. After Dr. Barakat purportedly performed an initial examination on JD, Dr. Barakat purportedly issued a prescription for (i) a TEJSD, which was used by Harmony OS to bill GEICO; (ii) a PCD, which was used by to Wellspring to bill GEICO; and (iii) a "Wearable PEMF Device", which was used by to Business Art Inc. ("Business Art") to bill GEICO.

(ii)    On August 27, 2024 an Insured named SB was purportedly involved in a motor vehicle accident. SB purportedly started treating at the Ralph Avenue Clinic with Dr. Barakat on September 5, 2024. After Dr. Barakat purportedly performed an initial examination on SB, Dr. Barakat

purportedly issued a prescription for (i) a PCD, which was used by Nexgen to bill GEICO; (ii) a TEJSD, which was used by Harmony OS to bill GEICO; and (iii) a "Neuromuscular stimulator, electronic shock unit device", "Non-thermal pulsed high frequency radiowaves, high peak power electromagnetic energy device", and "Equipo Medico Infrared Heat Pad with Low Level Light Therapy" which were all used by to Bloom A Inc. ("Bloom A") to bill GEICO.

(iii)    On April 9, 2024 an Insured named JRC was purportedly involved in a motor vehicle accident. JRC purportedly started treating at the Ralph Avenue Clinic with Dr. Barakat on April 18, 2024. After Dr. Barakat purportedly performed an initial examination on JRC, Dr. Barakat purportedly issued a prescription for: (i) a PCD, which was used by Wellspring to bill GEICO; (ii) a TEJSD, which was used by Vital Craft to bill GEICO; and (iii) "Neuromuscular stimulator, electronic shock unit device", "Non-thermal pulsed high frequency radiowaves, high peak power electromagnetic energy device", and "Equipo Medico Infrared Heat Pad with Low Level Light Therapy", which were all used by Gloss BK Inc. ("Gloss BK") to bill GEICO.

(iv)    On October 11, 2024 an Insured named CH was purportedly involved in a motor vehicle accident. CH purportedly started treating at the Ralph Avenue Clinic with Dr. Barakat on October 17, 2024. After Dr. Barakat purportedly performed an examination on CH, Dr. Barakat purportedly issued a prescription for (i) a PCD, which was used by Platinum Line to bill GEICO; and (ii) a TEJSD; (iii) "Neuromuscular stimulator, electronic shock unit device", (iv) "Non-thermal pulsed high frequency radiowaves, high peak power electromagnetic energy device", and (v) "Equipo Medico Infrared Heat Pad with Low Level Light Therapy", which it appears were not filled.

(v)    On July 28, 2024 an Insured named CP was purportedly involved in a motor vehicle accident. CP purportedly started treating at the Ralph Avenue Clinic with Dr. Barakat on August 12, 2024. After Dr. Barakat purportedly performed an initial examination on CP, Dr. Barakat purportedly issued a prescription for (i) a PCD, which was used by Nexgen to bill GEICO; (ii) a TEJSD, which was used by Harmony OS to bill GEICO; and (iii) "Neuromuscular stimulator, electronic shock unit device", "Non-thermal pulsed high frequency radiowaves, high peak power electromagnetic energy device", and "Equipo Medico Infrared Heat Pad with Low Level Light Therapy", which were all used by Gloss BK to bill GEICO. Additionally, Pinnacle dispensed an osteogenesis stimulator to CP without a prescription.

202.    These are only representative examples.

203.    In fact, virtually all of the Insureds identified in Exhibits "1" through "9" that received treatment at the Ralph Ave Clinic, the Liberty Ave Clinic, and the Southern Boulevard

Clinic were issued prescriptions for Fraudulent Equipment pursuant to the predetermined fraudulent protocol identified above.

204.    In further keeping with the fact that the prescriptions for Fraudulent Equipment from the Ralph Ave Clinic, the Liberty Ave Clinic, and the Southern Boulevard Clinic that were used to support the charges identified in Exhibits "1" through "9" were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, the contemporaneously dated medical records, such as an initial examination report or a follow-up examination report, virtually never identified all the Fraudulent Equipment purportedly prescribed to the Insureds.

205.    Also, and in keeping with the fact that the prescriptions for Fraudulent Equipment from the Ralph Ave Clinic, the Liberty Ave Clinic, and the Southern Boulevard Clinic were not medically necessary and issued pursuant to a predetermined fraudulent protocol, the contemporaneous examination reports failed to identify, often in any way, the Fraudulent Equipment prescribed to Insureds, if the report identified the Fraudulent Equipment at all.

206.    To the extent that the contemporaneous reports issued by Dr. Barakat at the Ralph Ave Clinic, the Liberty Ave Clinic, and the Southern Boulevard Clinic did reference any of the Fraudulent Equipment prescribed, the evaluation reports virtually never contained any specific detail explaining why or how the prescribed Fraudulent Equipment would benefit or aid the Insured.

207.    Furthermore, and in keeping with the fact that the prescriptions for Fraudulent Equipment from Dr. Barakat at the Ralph Ave Clinic, the Liberty Ave Clinic, and the Southern Boulevard Clinic were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, to the extent that Insureds underwent follow-up examinations with Dr. Barakat, the follow-up examination reports never referenced or discussed the Insureds' previously

prescribed Fraudulent Equipment, and virtually never provided any indication whether to continue using any of previously prescribed Fraudulent Equipment.

208.    In a legitimate setting, when a patient returns for a follow-up examination after being prescribed DME, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME or newly issued DME.

209.    However, the follow-up examination reports from Barakat at the Ralph Ave Clinic, the Liberty Ave Clinic, and the Southern Boulevard Clinic failed to include any meaningful information regarding the Fraudulent Equipment prescribed to the Insureds on a prior date.

210.    Additionally, as part of the fraudulent scheme between Defendants and unidentified third-party individuals associated with the Ralph Ave Clinic, the Liberty Ave Clinic, and the Southern Boulevard Clinic, the prescriptions from Barakat at the Ralph Ave Clinic, the Liberty Ave Clinic, and the Southern Boulevard Clinic were never given to the Insureds but were routed directly to Defendants, or other DME suppliers, thus taking any risk out of the equation that an Insured would fill the prescription from an outside source or not fill all or part of the prescription. In fact, in many cases, the Insureds were provided with Fraudulent Equipment directly from receptionists at the Ralph Ave Clinic, the Liberty Ave Clinic, and the Southern Boulevard Clinic, without any interaction with or instruction concerning their use from either Defendants or a healthcare provider.

211.    Also as part of the fraudulent scheme, the prescriptions purportedly issued by Referring Providers at the Ralph Ave Clinic, the Liberty Ave Clinic, and the Southern Boulevard Clinic were purposefully generic and vague to allow Defendants to choose the specific type of

PCD that they purported to provide Insureds and bill GEICO and other New York automobile insurers, in order to increase their financial gain.

### ii. The Predetermined Fraudulent Protocol at the Cross Island Plaza Clinic

212.    The Cross Island Plaza Clinic was one of the Clinics where Defendants conspired with the John Doe Defendants to obtain medically unnecessary prescriptions for Fraudulent Equipment pursuant to a predetermined fraudulent protocol.

213.    After their involvement in minor "fender-bender" motor vehicle accidents, many of the Insureds who purportedly received Fraudulent Equipment from TM OS, Vital Craft and/or Platinum Line identified in Exhibits "5", "6", and "9", purportedly received treatment from NP Cummings at the Cross Island Plaza Clinic.

214.    Virtually every Insured identified in Exhibits "5", "6", and "9" who purportedly received treatment from NP Cummings at the Cross Island Plaza Clinic was provided with an initial examination from a healthcare provider. Thereafter, each of the Insureds were prescribed multiple items of Fraudulent Equipment.

215.    When the Insureds sought treatment with and were purportedly provided with an initial evaluation by Cummings at the Cross Island Plaza Clinic, NP Cummings did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME to provide.

216.    Rather, NP Cummings purportedly issued prescriptions for a predetermined set of Fraudulent Equipment to each Insured after a purported initial examination based upon a predetermined fraudulent protocol.

217.    In keeping with the fact that the prescriptions issued to the Insureds by NP Cummings at the Cross Island Plaza Clinic after purported initial examinations were not medically

necessary and were issued pursuant to predetermined fraudulent protocols, the Referring Providers never evaluated each Insured's individual symptoms or presentation to determine whether and what type of DME would aid in each Insured's treatment.

218.    Instead, and in keeping with the fact that the prescriptions issued to the Insureds after their initial examinations were not medically necessary and were issued pursuant to predetermined fraudulent protocols, virtually every Insured who underwent an initial examination with NP Cummings at the Cross Island Plaza Clinic received a prescription for virtually the same type of Fraudulent Equipment.

219.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, after a purported initial examination at the Cross Island Plaza Clinic, NP Cummings virtually always prescribed, at a minimum,  the following Fraudulent Equipment: (i) TEJSD; and (ii) "Orthopedic Car Seat"; and/or (i) PCD; and "Wearable PEMF Device".

220.    In also keeping with the fact that the prescriptions for Fraudulent Equipment from NP Cummings at the Cross Island Plaza Clinic were fraudulently issued by unidentifiable third-party individuals and not the Referring Providers whose names were on the prescriptions, virtually all of the Insureds identified in Exhibits 5", "6", and "9" received a single prescription for all of the above identified DME which was then divided among the DME Defendants and others.

221.    Upon information and belief, a single prescription issued to insureds on a single date were divided among DME companies as part of the scheme between Defendants and unidentifiable third-party individuals to provide Defendants with the ability to submit separate bills to GEICO for reimbursement of No-Fault Benefits in a way to lower the amount charged to

GEICO on each bill so Defendants could avoid detection of their fraudulent schemes.

222.    There is no legitimate reason why a single prescription would be split among multiple DME companies. What is more, there is no legitimate reason why this would occur in virtually all of the Insureds identified in Exhibits "5", "6", and "9" who treated with NP Cummings at the Cross Island Plaza Clinic.

223.    Even more, the predetermined fraudulent protocols established at the Cross Island Plaza Clinic where Insureds were provided with multiple prescriptions for virtually identical Fraudulent Equipment were not isolated to prescriptions provided to Defendants. In many circumstances, the prescriptions for the Insureds identified in Exhibits "5", "6", and "9" were provided to DME Defendant TM OS, Vital Craft, and/or Platinum Line *and* another DME supplier.

224.    For example:

(i)      On November 10, 2023 an Insured named MD was purportedly involved in a motor vehicle accident. MD purportedly started treating at the Cross Island Plaza Clinic with NP Cummings on November 13, 2023. After NP Cummings purportedly performed an initial examination on MD, NP Cummings purportedly issued a prescription for a TEJSD and an "Orthopedic Car Seat" that was provided to TM OS and Concept Line Inc. ("Concept Line").

(ii)     On September 22, 2023 an Insured named SF was purportedly involved in a motor vehicle accident. SF purportedly started treating at the Cross Island Plaza Clinic with NP Cummings on November 13, 2023. After NP Cummings purportedly performed an initial examination on SF, NP Cummings purportedly issued a prescription for a TEJSD and an "Orthopedic Car Seat" that was provided to TM OS and Concept Line.

(iii)    On October 28, 2023 an Insured named GS was purportedly involved in a motor vehicle accident. GS purportedly started treating at the Cross Island Plaza Clinic with NP Cummings on October 30, 2023. After NP Cummings purportedly performed an initial examination on GS, NP Cummings purportedly issued a prescription for a TEJSD and an "Orthopedic Car Seat" that was provided to Vital Craft and Concept Line.

(iv)     On February 9, 2024 an Insured named BP was purportedly involved in a motor vehicle accident. BP purportedly started treating at the Cross Island Plaza Clinic with NP Cummings on February 12, 2024. After NP

Cummings purportedly performed an initial examination on BP, NP Cummings purportedly issued a prescription for a TEJSD and an "Orthopedic Car Seat" that was provided to Vital Craft and Concept Line.

(v)     On August 24, 2024 an Insured named KF was purportedly involved in a motor vehicle accident. KF purportedly started treating at the Cross Island Plaza Clinic with NP Cummings on September 4, 2024. After NP Cummings purportedly performed an initial examination on KF, NP Cummings purportedly issued a prescription for a PCD that was provided to Platinum Line, and a "wearable PEMF" that was provided to J Flexible Corp.

225.    These are only representative examples.

226.    In fact, virtually all of the Insureds identified in Exhibits "5", "6", and "9" that received treatment at the Cross Island Plaza Clinic were issued prescriptions for Fraudulent Equipment pursuant to the predetermined fraudulent protocol identified above

227.    In further keeping with the fact that the prescriptions for Fraudulent Equipment from the Cross Island Plaza Clinic that were used to support the charges identified in Exhibits "5", "6", and "9" were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, the contemporaneously dated medical records, such as an initial examination report or a follow-up examination report, virtually never accurately identified the Fraudulent Equipment purportedly prescribed to the Insureds. Rather, the examination reports stated "[c]onsider durable medical equipment for at home use including Game-Ready, SAM, Cervical Collar, Cervical Pillow, Lumbar Sacral Support, Lumbar Cushion, Bed Board, Egg Crate Mattress, Orthopedic Massage Chair, EMS unit 4 leads, TENS/EMS placement belt, Infrared Red Heating Leamp and Massager to the extent they are medically necessary."

228.    Also, and in keeping with the fact that the prescriptions for Fraudulent Equipment from the Cross Island Plaza Clinic were not medically necessary and issued pursuant to a predetermined fraudulent protocol, the contemporaneous examination reports failed to identify,

sometimes in any way, the Fraudulent Equipment prescribed to Insureds, if the report identified the Fraudulent Equipment at all.

229.    To the extent that the contemporaneous reports issued by Referring Providers at the Cross Island Plaza Clinic did reference any of the Fraudulent Equipment prescribed, the evaluation reports virtually never contained any specific detail explaining why or how the prescribed Fraudulent Equipment would benefit or aid the Insured.

230.    Furthermore, and in keeping with the fact that the prescriptions for Fraudulent Equipment from the Cross Island Plaza Clinic were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, to the extent Insureds underwent a follow-up examination with NP Cummings the follow-up examination reports virtually never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment, and virtually never provided any indication whether to continue using any of previously prescribed Fraudulent Equipment.

231.    In a legitimate setting, when a patient returns for a follow-up examination after being prescribed DME, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME or newly issued DME.

232.    However, the follow-up examination reports from Referring Providers at the Cross Island Plaza Clinic failed to include any meaningful information regarding the Fraudulent Equipment prescribed to the Insureds on a prior date.

233.    Additionally, as part of the fraudulent scheme between Defendants and unidentified third-party individuals associated with the Cross Island Plaza Clinic, the prescriptions from the Cross Island Plaza Clinic were never given to the Insureds but were routed directly to Defendants,

or other DME suppliers, thus taking any risk out of the equation that an Insured would fill the prescription from an outside source or not fill all or part of the prescription. In fact, in many cases, the Insureds were provided with Fraudulent Equipment directly from receptionists at the Cross Island Plaza Clinic, without any interaction with or instruction concerning their use from either Defendants or a healthcare provider.

### iii. The Predetermined Fraudulent Protocol at the East Gun Hill Road Clinic and the Surf Avenue Clinic

234.    The East Gun Hill Road Clinic and the Surf Avenue Clinic were two of the Clinics where Defendants conspired with others who are not presently identifiable to obtain medically unnecessary prescriptions for Fraudulent Equipment pursuant to a predetermined fraudulent protocol.

235.    After their involvement in minor "fender-bender" motor vehicle accidents, many of the Insureds who purportedly received Fraudulent Equipment from Luminex, Vital Craft, and/or TM OS, and identified in Exhibits "2", "5", "6", and "9" purportedly received treatment from an employee of Beach Medical Rehabilitation PC ("Beach Medical") at the Surf Avenue Clinic or South Bronx Medical Rehabilitation PC ("South Bronx Medical") at the East Gun Hill Road Clinic, including John McGee, DO ("Dr. McGee") and/or Deonarine Rampershad NP ("NP Rampershad").

236.    Virtually every Insured identified in Exhibits "2", "5", "6", and "9" who purportedly treated with Beach Medical at the Surf Avenue Clinic, or South Bronx Medical at the East Gun Hill Road Clinic was provided with an initial examination from a healthcare provider. After their purported initial examination, each of the Insureds were prescribed multiple items of Fraudulent Equipment.

237.    When the Insureds sought treatment with and were purportedly provided with an

initial evaluation by Beach Medical at the Surf Avenue Clinic, or South Bronx Medical at the East Gun Hill Road Clinic, they did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME to provide.

238.    Rather, Referring Providers at the East Gun Hill Road Clinic or the Surf Avenue Clinic purportedly issued prescriptions for a predetermined set of Fraudulent Equipment to each Insured after a purported initial examination based upon a predetermined fraudulent protocol.

239.    In keeping with the fact that the prescriptions issued to the Insureds by Referring Providers at the East Gun Hill Road Clinic and the Surf Avenue Clinic after purported initial examinations were not medically necessary and were issued pursuant to predetermined fraudulent protocols, the Referring Providers never evaluated each Insured's individual symptoms or presentation to determine whether and what type of DME would aid in each Insured's treatment.

240.    Instead, and in keeping with the fact that the prescriptions issued to the Insureds after their initial examinations were not medically necessary and were issued pursuant to predetermined fraudulent protocols, virtually every Insured who underwent an initial examination at the East Gun Hill Road Clinic and the Surf Avenue Clinic received a prescription for virtually the same type of Fraudulent Equipment.

241.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, after a purported initial examination with Beach Medical at the Surf Avenue Clinic, or South Bronx Medical at the East Gun Hill Road Clinic, Referring Providers virtually always prescribed, at a minimum, the following Fraudulent Equipment: (i) PCD; (ii) "Wearable PEMF Device"; and (iii) TEJSD.

242.    In also keeping with the fact that the prescriptions for Fraudulent Equipment from

the East Gun Hill Road Clinic and the Surf Avenue Clinic were fraudulently issued by unidentifiable third-party individuals and not the Referring Providers whose names were on the prescriptions, virtually all of the Insureds identified in Exhibits "2", "5", "6", and "9" received a single prescription for all of the above identified DME which was then divided among the DME Defendants and others.

243.    Upon information and belief, a single prescription issued to insureds on a single date were divided among DME companies as part of the scheme between Defendants and unidentifiable third-party individuals to provide Defendants with the ability to submit separate bills to GEICO for reimbursement of No-Fault Benefits in a way to lower the amount charged to GEICO on each bill so Defendants could avoid detection of their fraudulent schemes.

244.    There is no legitimate reason why a single prescription would be split among multiple DME companies. more, there is no legitimate reason why this would occur in virtually all of the Insureds identified in Exhibits "2", "5", "6", and "9" who treated at the East Gun Hill Road Clinic and the Surf Avenue Clinic.

245.    Even more, the predetermined fraudulent protocols established at the East Gun Hill Road Clinic and the Surf Avenue Clinic where Insureds were provided with multiple prescriptions for virtually identical Fraudulent Equipment were not isolated to prescriptions provided to Defendants. In many circumstances, the prescriptions for the Insureds identified in Exhibits "2", "5", "6", and "9" were provided to DME Defendant TM OS or Vital Care OS, Luminex, Platinum Line, *and* other DME suppliers.

246.    For example:

   (i)    On February 15, 2024 an Insured named LA was purportedly involved in a motor vehicle accident. LA purportedly started treating with Beach Medical at the Surf Avenue Clinic with Yampu Freeman PA ("PA Freeman"), and Dr. McGee on February 21, 2024. After PA Freeman purportedly performed

an initial examination on LA, Dr. McGee purportedly issued a prescription for: (i) a PCD that was used by Luminex to bill GEICO; (ii) a "Wearable PEMF Device" that appears to have not been provided; and (iii) a TEJSD that was used by Vital Craft to bill GEICO. Additionally, Dr. McGee purportedly issued a separate prescription for a "water circ heat w/ pump" that was provided to Global OS LLC ("Global OS").

(ii)    On October 31, 2024 an Insured named AB was purportedly involved in a motor vehicle accident. AB purportedly started treating with Beach Medical at the Surf Avenue Clinic with PA Freeman and Dr. McGee on November 1, 2023. After Dr. McGee purportedly performed an initial examination on AB, Dr. McGee purportedly issued a prescription for: (i) a PCD that was used by Luminex to bill GEICO; (ii) a "Wearable PEMF Device" that was used by Biometric Sign Inc. ("Biometric") to bill GEICO; and (iii) a TEJSD that appears to have never to have not been provided.

(iii)    On October 31, 2024 an Insured named TN was purportedly involved in a motor vehicle accident. TN purportedly started treating with Beach Medical at the Surf Avenue Clinic with PA Freeman and Dr. McGee on November 1, 2023. After Dr. McGee purportedly performed an initial examination on TN, Dr. McGee purportedly issued a prescription for: (i) a PCD that was used by Luminex to bill GEICO; (ii) a "Wearable PEMF Device" that was used by Biometric to bill GEICO; and (iii) a TEJSD that was used by TM OS to bill GEICO.

(iv)    On October 26, 2023 an Insured named WM was purportedly involved in a motor vehicle accident. WM purportedly started treating with South Bronx Medical at the East Gun Hill Road Clinic with NP Rampershad and Dr. McGee on November 2, 2023. After NP Rampershad purportedly performed an initial examination on WM, Dr. McGee purportedly issued a prescription for: (i) a PCD that was used by Luminex to bill GEICO; (ii) a "Wearable PEMF Device" that was used by MB Century Inc. ("MB Century") to bill GEICO; and (iii) a TEJSD that was used by TM OS to bill GEICO.

(v)    On October 26, 2023 an Insured named AP was purportedly involved in a motor vehicle accident. AP purportedly started treating with South Bronx Medical at the East Gun Hill Road Clinic with NP Rampershad on November 2, 2023. After NP Rampershad purportedly performed an initial examination on AP, Dr. McGee purportedly issued a prescription for: (i) a PCD that was used by Luminex to bill GEICO; (ii) a "Wearable PEMF Device" that was used by MB Century to bill GEICO; and (iii) a TEJSD that was used by TM OS to bill GEICO.

247.    These are only representative examples.

248.    In fact, virtually all of the Insureds identified in Exhibits "2", "5", "6", and "9" that

received treatment with South Bronx Medical at the East Gun Hill Road Clinic or Beach Medical at the Surf Avenue Clinic were issued prescriptions for Fraudulent Equipment pursuant to the predetermined fraudulent protocol identified above

249.    In further keeping with the fact that the prescriptions for Fraudulent Equipment from the East Gun Hill Road Clinic and the Surf Avenue Clinic that were used to support the charges identified in Exhibits "2", "5", "6", and "9" were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, the contemporaneously dated medical records, such as an initial examination report or a follow-up examination report, virtually never identified the specific Fraudulent Equipment purportedly prescribed to the Insureds.

250.    Also, and in keeping with the fact that the prescriptions for Fraudulent Equipment from the East Gun Hill Road Clinic and the Surf Avenue Clinic were not medically necessary and issued pursuant to a predetermined fraudulent protocol, the contemporaneous examination reports virtually never accurately identified the Fraudulent Equipment purportedly prescribed to the Insureds. Rather, the examination reports stated "[c]onsider durable medical equipment for at home use including Game-Ready, SAM, Cervical Collar, Cervical Pillow, Lumbar Sacral Support, Lumbar Cushion, Bed Board, Egg Crate Mattress, Orthopedic Massage Chair, EMS unit 4 leads, TENS/EMS placement belt, Infrared Red Heating Leamp and Massager to the extent they are medically necessary."

251.    To the extent that the contemporaneous reports issued by Referring Providers at the East Gun Hill Road Clinic and the Surf Avenue Clinic did reference any of the Fraudulent Equipment prescribed, the evaluation reports virtually never contained any specific detail explaining why or how the prescribed Fraudulent Equipment would benefit or aid the Insured.

252.    Furthermore, and in keeping with the fact that the prescriptions for Fraudulent

Equipment from the East Gun Hill Road Clinic and the Surf Avenue Clinic were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, to the extent that Insureds underwent follow-up examinations, the follow-up examination reports never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment, and virtually never provided any indication whether to continue using any of previously prescribed Fraudulent Equipment.

253.    In a legitimate setting, when a patient returns for a follow-up examination after being prescribed DME, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME or newly issued DME.

254.    However, the follow-up examination reports from Referring Providers at the East Gun Hill Road Clinic and the Surf Avenue Clinic failed to include any meaningful information regarding the Fraudulent Equipment prescribed to the Insureds on a prior date.

255.    Additionally, as part of the fraudulent scheme between Defendants and unidentified third-party individuals associated with the East Gun Hill Road Clinic and the Surf Avenue Clinic, the prescriptions from the East Gun Hill Road Clinic and the Surf Avenue Clinic were never given to the Insureds but were routed directly to Defendants, or other DME suppliers, thus taking any risk out of the equation that an Insured would fill the prescription from an outside source or not fill all or part of the prescription. In fact, in many cases, the Insureds were provided with Fraudulent Equipment directly from receptionists at the East Gun Hill Road Clinic and the Surf Avenue Clinic, without any interaction with or instruction concerning their use from either Defendants or a healthcare provider.

256. Finally, as part of the fraudulent scheme, the prescriptions purportedly issued by Referring Providers at the East Gun Hill Road Clinic and the Surf Avenue Clinic were purposefully generic and vague to allow Defendants to choose the specific type of PCD that they purported to provide Insureds and bill GEICO and other New York automobile insurers, in order to increase their financial gain.

**F.     The Improper Distribution of Fraudulent Equipment to Insureds by Defendants Without Valid Prescriptions**

257. As a threshold matter, for a prescription to be valid it must first actually be issued by a healthcare provider who has determined that such a prescription is medically necessary.

258. However, many of the prescriptions for Fraudulent Equipment purportedly issued by Referring Providers from the Clinics were not valid prescriptions as they routinely: (i) contained a photocopied or stamped signature of the Referring Provider; and (ii) were not referenced or explained in any contemporaneous medical record. Additionally, at times, the prescriptions (i) were undated, and/or (ii) were issued on dates the Referring Provider never examined or otherwise treated the Insured.

259. In addition, the DME Providers are not licensed medical professional corporations, and the Paper Owner Defendants are not licensed to prescribe DME to Insureds. As such, Defendants were not lawfully permitted to prescribe or otherwise determine what DME is medically necessary for the Insureds. For the same reason, Defendants cannot properly dispense DME to an Insured without a valid prescription from a licensed healthcare professional that definitively identifies medically necessary DME to be provided.

260. However, as part of the fraudulent scheme, in many of the fraudulent claims identified in Exhibits "1" through "4", and "9" Defendants improperly decided what PCD to provide to Insureds without a valid definitive prescription from a licensed healthcare provider to

the extent that they actually provided any DME to the Insureds.

261.    Furthermore, in all of the fraudulent claims identified in Exhibit "8", Defendants improperly decided what DME to provide to Insureds without a valid definitive prescription from a licensed healthcare provider because Defendants provided osteogenesis stimulators in response to a prescription ordering a "Wearable PEMF Device".

262.    More specifically, the prescriptions for DME purportedly issued by the Referring Providers and provided to Defendants did not definitively the type of PCD to be provided to the Insureds. For example, the prescriptions did not: (i) provide a specific HCPCS Code for the PCD to be provided; or (ii) provide sufficient detail to direct Defendants to a unique type of PCD.

263.    While the prescriptions purportedly issued by the Referring Providers did not identify a specific type of medically necessary PCD for the Insureds, Defendants did not obtain any additional documentation from the Referring Providers approving or otherwise acknowledging that a specific type of PCD – either by HCPCS Code or a detailed description – was medically necessary for the Insureds.

264.    These vague and generic prescriptions purportedly issued by the Referring Providers were intended to and actually provided Defendants with the opportunity to select from among several different pieces of Fraudulent Equipment, each having varying reimbursement rates in the Medicaid Fee Schedule.

265.    In a legitimate clinical setting, when a DME Supplier would obtain a prescription that did not contain a HCPCS Code or a sufficient description to identify a specific item of DME, the DME Supplier would contact the referring healthcare provider to request clarification on the specific items that were being requested, including the features and requirements to dispense the appropriate DME prescribed to each patient.

266.    As also part of a legitimate clinical setting, the DME Supplier would have the referring healthcare provider sign documentation to confirm that the specific item of DME – identified by HCPCS Code or a detailed description – was medically necessary for the patient.

267.    Upon information and belief, Defendants never contacted the referring healthcare providers to seek instruction and/or clarification but rather made their own determination as to the specific Fraudulent Equipment purportedly provided to each Insured. Not surprisingly, Defendants each elected to provide the Insureds with PCDs that had a reimbursement rate in the higher end of the permissible range under the Medicaid Fee Schedule.

268.    The Fraudulent Equipment provided to the Insureds identified in Exhibits "1" through "4" – to the extent that the Fraudulent Equipment was actually provided – by Defendants was not based on: (i) prescriptions by licensed healthcare providers containing sufficient detail to identify unique types DME; or (ii) a determination by a licensed healthcare provider that the specific items dispensed to the Insureds were medically necessity. Rather, the Fraudulent Equipment identified in Exhibits "1" through "4" were the result of decisions made by Defendants.

269.    In all the claims identified in Exhibits "1" through "9" that were based upon vague and generic language contained in the prescriptions, Defendants falsely represented that the Fraudulent Equipment purportedly provided to Insureds was based upon prescriptions for reasonable and medically necessary DME issued by healthcare providers with lawful authority to do so. To the contrary, the Fraudulent Equipment was purportedly provided by Defendants own determination of what unique types of Fraudulent Equipment to purportedly provide, and, thus, was not eligible for reimbursement of PIP Benefits.

**III.      The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO**

270.    To support their fraudulent charges, Defendants systematically submitted or caused

to be submitted hundreds of NF-3 forms or HCFA-1500 forms to GEICO through and in the names

of the DME Entities, seeking payment for Fraudulent Equipment.

271.    The NF-3 forms or HCFA-1500 forms that Defendants submitted or caused to be

submitted to GEICO were false and misleading in the following material respects:

> (i)    The NF-3 forms, HCFA-1500 forms, treatment reports, prescriptions, and
> delivery receipts uniformly misrepresented to GEICO that Defendants
> provided Fraudulent Equipment pursuant to prescriptions by licensed
> healthcare providers for reasonable and medically necessary DME and
> therefore were entitled to receive No-Fault Benefits. In fact, Defendants
> were not entitled to receive No-Fault Benefits because, to the extent that
> Defendants provided any of Fraudulent Equipment, they were not properly
> licensed by the DCWP as they falsified the information contained in their
> application for a Dealer for Products License.

> (ii)   The NF-3 forms, HCFA-1500 forms, and prescriptions uniformly
> misrepresented to GEICO that Defendants provided Fraudulent Equipment
> pursuant to prescriptions by licensed healthcare providers for reasonable and
> medically necessary DME and therefore, were entitled to receive No-Fault
> Benefits. In fact, Defendants were not entitled to receive No-Fault Benefits
> because, to the extent that Defendants provided any of Fraudulent Equipment,
> it was based upon: (a) unlawful financial arrangements with others who are
> not presently identifiable; (b) predetermined fraudulent protocols without
> regard for the medical necessity of the items; and (c) decisions made by
> laypersons not based upon lawful prescriptions from licensed healthcare
> providers for medically necessary items.

**IV.      The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

272.    The Defendants were legally and ethically obligated to act honestly and with

integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

273.    To induce GEICO to promptly pay the fraudulent charges for Fraudulent Equipment,

Defendants systemically concealed their fraud and went to great lengths to accomplish this

concealment.

274.    Specifically, they knowingly misrepresented that they were lawfully licensed by the

City of New York as they never complied with regulations requiring the DME Providers to obtain a

Dealer in Products License from the DCWP because they falsely indicated, under penalty for false statements, in the application for a Dealer in Products License of the Secret Owners ownership interest for each of the DME Providers, and concealed these misrepresentations in order to submit bills to GEICO and prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

275.    The Defendants also knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were not based upon medical necessity but rather were based upon predetermined fraudulent protocols as a result of unlawful financial arrangements, were provided directly to the DME Entities without the involvement of Insureds, and ultimately used as the basis to submit bills to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment was billed to GEICO for financial gain.

276.    Additionally, Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon predetermined protocols and without medical necessity in order to prevent GEICO from discovering that Fraudulent Equipment was billed to GEICO for financial gain.

277.    Furthermore, Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon decisions made by laypersons who did not have the legal authority to issue medically necessary DME, and not by an actual healthcare provider's prescription for medically necessary DME, in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain

278.    The billing and supporting documentation submitted by the DME Entities, when viewed in isolation, did not reveal its fraudulent nature.

279.    GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

280.    In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through Defendants; or (ii) timely issued requests for verification with respect to all of the pending claims for No-Fault Benefits submitted through Defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

281.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file numerous individual, expensive, and time-consuming collection proceedings, in piece-meal fashion against GEICO and other insurers. The Defendants' collection efforts through the filing and prosecution of numerous separate No-Fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme, since they know it is impractical for an arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address Defendants' large-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area. The purpose of the mass filings of no-fault collection proceedings is to obtain adjudication on the fraudulent billing while obfuscating the fraudulent activity and further perpetuating the RICO enterprises.

282.    In fact, Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that DME Defendants have been engaged in widespread fraud.

283.     GEICO is under statutory and contractual obligations to promptly and fairly process claims within thirty (30) days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $1,000,000.00 based upon the fraudulent charges representing payments made by GEICO to Defendants.

284.     Based upon Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against the DME Providers
### (Harmony OS, Nexgen, TM OS, Vital Craft, Wellspring, BSD, Luminex, Platinum Line, and Pinnacle)
### (Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)

285.     GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

286.     There is an actual case in controversy between GEICO and each of the DME Providers regarding more than $4.3 million in fraudulent billing that has been submitted to GEICO in the names of the DME Providers.

287.     The DME Providers have no right to receive payment for any pending bills submitted to GEICO because Defendants did not comply with all local licensing laws as the DME Providers falsified their business addresses and the identities of the corporate owners on the applications for Dealer in Products Licenses, and thus, were not properly lawfully licensed by the DCWP as required by regulations from the City of New York.

288.    The DME Providers also have no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were issued – not due to medical necessity but – as a result of its participation in unlawful financial arrangements.

289.    The DME Providers have no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO were issued – not due to medical necessity but – pursuant to predetermined fraudulent protocols designed solely to financially enrich Defendants and others who are not presently known, rather than to treat the Insureds.

290.    The DME Providers have no right to receive payment for any pending bills submitted to GEICO because the DME Providers purportedly provided Fraudulent Equipment as a result of decisions made by laypersons, not based upon prescriptions for medically necessary items issued by healthcare providers who are licensed to issue such prescriptions.

291.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of Harmony OS, Nexgen, TM OS, Vital Craft, Wellspring, BSD, Luminex, Platinum Line, and Pinnacle.

## SECOND CAUSE OF ACTION
### Against the Paper Owner Defendants and John Doe Defendant "1"
### (Violation of RICO, 18 U.S.C. § 1962(c))

292.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

293.    Harmony OS, Nexgen, TM OS, Vital Craft, Wellspring, BSD, Luminex, Platinum Line, and Pinnacle together constitute an association-in-fact "enterprise" (the "DME Provider

Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

294.    The members of the DME Provider Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Harmony OS, Nexgen, TM OS, Vital Craft, Wellspring, BSD, Luminex, Platinum Line, and Pinnacle are ostensibly independent businesses – with different names and tax identification numbers – that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO and other New York automobile insurers.

295.    The DME Provider Enterprise operated under multiple separate names and tax identification numbers in order to limit the time period and volume of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the DME Provider Enterprise acting singly or without the aid of each other.

296.    The DME Provider Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing and coordinating many individuals who have been responsible for facilitating and performing a wide variety of administrative and ostensibly professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and

accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

297.    The Paper Owner Defendants and John Doe Defendant "1" have each been employed by and/or associated with the DME Provider Enterprise.

298.    Paper Owner Defendants and John Doe Defendant "1" knowingly have conducted and/or participated, directly or indirectly, in the conduct of the DME Provider Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the DME Provider Enterprise was not eligible to receive under the No-Fault Laws, because: (i) in every claim, the DME Providers misrepresented that they had lawful Dealer in Products Licenses and were entitled to No-Fault Benefits when in fact none of the DME Providers were lawfully licensed as they knowingly falsified information on their applications for a Dealer in Products License; (ii) in every claim, the DME Providers misrepresented that the Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) in every claim, the DME Providers misrepresented that the Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were forged and/or duplicated, provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; and (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, the DME Providers misrepresented that the Fraudulent Equipment issued was based upon legitimate prescriptions identifying medically necessary DME by licensed healthcare providers when the

Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" through "9".

299.    The DME Providers Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which the Paper Owner Defendants and John Doe Defendant "1" operated the DME Providers, inasmuch as the DME Providers never operated as a legitimate DME provider, never was entitled to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for the DME Providers to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to bill GEICO and other New York automobile insurers and attempt collection on the fraudulent billing submitted through the DME Providers to the present day.

300.    The DME Providers Enterprise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the DME Providers Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-fault billing.

301.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,000,000.00 pursuant to the fraudulent bills submitted by Defendants through the DME Providers Enterprise.

302.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against the Paper Owner Defendants and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

303.     GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

304.     The DME Providers Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

305.     The Paper Owner Defendants and the John Doe Defendants are employed by and/or associated with the DME Providers Enterprise.

306.     The Paper Owner Defendants and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the DME Providers Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the DME Providers were not eligible to receive under the No-Fault Laws because: (i) in every claim, the DME Providers misrepresented that they had lawful Dealer in Products Licenses and were entitled to No-Fault Benefits when in fact none of the DME Providers were lawfully licensed as they knowingly falsified information on their applications for a Dealer in Products License; (ii) in every claim, the DME Providers misrepresented that the Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) in every claim, the DME Providers misrepresented that the Fraudulent Equipment were for

reasonable and medically necessary DME when in fact the prescriptions were forged and/or duplicated, provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; and (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, the DME Providers misrepresented that the Fraudulent Equipment issued was based upon legitimate prescriptions identifying medically necessary DME by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" through "9".

307.    The Paper Owner Defendants and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

308.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,000,000.00 pursuant to the fraudulent bills submitted by Defendants through the DME Providers Enterprise.

309.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**Against Harmony OS, Radzik, and John Doe Defendant "1"**
**(Common Law Fraud)**

310.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

311.    Harmony OS, Radzik, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from

GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

312.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Harmony OS had a lawful Dealer in Products Licenses and were entitled to No-Fault Benefits when in fact Harmony OS was not lawfully licensed as they knowingly falsified the business owner and operating address information on their application for a Dealer in Products; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; and (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were forged and/or duplicated and provided pursuant to predetermined fraudulent protocols and not based upon medical necessity.

313.    Harmony OS, Radzik, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Harmony OS that were not compensable under New York no-fault insurance laws.

314.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $78,000.00 pursuant to the fraudulent bills submitted by Harmony OS, Radzik, and John Doe Defendant "1".

315.     Harmony OS, Radzik, and John Doe Defendant "1" extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

316.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against Harmony OS, Radzik, and John Doe Defendant "1"
### (Unjust Enrichment)

317.     GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

318.     As set forth above, Harmony OS, Radzik, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

319.     When GEICO paid the bills and charges submitted by or on behalf of Harmony OS for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

320.     Harmony OS, Radzik, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Harmony OS, Radzik, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

321.     The retention of GEICO's payments by Harmony OS, Radzik, and John Doe Defendant "1" violates fundamental principles of justice, equity and good conscience.

322.     By reason of the above, Harmony OS, Radzik, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $78,000.00.

## SIXTH CAUSE OF ACTION
### Against Nexgen, Bennissim, and John Doe Defendant "1"
### (Common Law Fraud)

323.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

324.    Nexgen, Bennissim, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

325.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Nexgen had a lawful Dealer in Products Licenses and were entitled to No-Fault Benefits when in fact Nexgen was not lawfully licensed as they knowingly falsified the business owner and business address information on their application for a Dealer in Products; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were forged and/or duplicated, provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; and (iv) the representation the Fraudulent Equipment issued to Insureds was based upon legitimate prescriptions by licensed healthcare providers identifying medically necessary DME when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME.

326. Nexgen, Bennissim, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Nexgen that were not compensable under New York no-fault insurance laws.

327. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $121,000.00 pursuant to the fraudulent bills submitted by Nexgen, Bennissim, and John Doe Defendant "1".

328. Nexgen, Bennissim, and John Doe Defendant "1" extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

329. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**Against Nexgen, Bennissim, and John Doe Defendant "1"**
**(Unjust Enrichment)**

330. GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

331. As set forth above, Nexgen, Bennissim, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

332. When GEICO paid the bills and charges submitted by or on behalf of Nexgen for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

333.    Nexgen, Bennissim, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Nexgen, Bennissim, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

334.    The retention of GEICO's payments by Nexgen, Bennissim, and John Doe Defendant "1" violates fundamental principles of justice, equity and good conscience.

335.    By reason of the above, Nexgen, Bennissim, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $121,000.00.

### EIGHTH CAUSE OF ACTION
**Against Wellspring, Bennissim, and John Doe Defendant "1"**
**(Common Law Fraud)**

336.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

337.    Wellspring, Bennissim, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

338.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Wellspring had a lawful Dealer in Products Licenses and were entitled to No-Fault Benefits when in fact Wellspring was not lawfully licensed as they knowingly falsified the business owner and business address information on their application for a Dealer in Products; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in

the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were forged and/or duplicated, provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; and (iv) the representation the Fraudulent Equipment issued to Insureds was based upon legitimate prescriptions by licensed healthcare providers identifying medically necessary DME when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME.

339.    Wellspring, Bennissim, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Wellspring that were not compensable under New York no-fault insurance laws.

340.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $239,000.00 pursuant to the fraudulent bills submitted by Wellspring, Bennissim, and John Doe Defendant "1".

341.    Wellspring, Bennissim, and John Doe Defendant "1" extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

342.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
**Against Wellspring, Bennissim, and John Doe Defendant "1"**
**(Unjust Enrichment)**

343.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

344.    As set forth above, Wellspring, Bennissim, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

345.    When GEICO paid the bills and charges submitted by or on behalf of Wellspring for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

346.    Wellspring, Bennissim, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Wellspring, Bennissim, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

347.    The retention of GEICO's payments by Wellspring, Bennissim, and John Doe Defendant "1" violates fundamental principles of justice, equity and good conscience.

348.    By reason of the above, Wellspring, Bennissim, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $239,000.00.

### TENTH CAUSE OF ACTION
**Against TM OS, Pelta, and John Doe Defendant "1"**
**(Common Law Fraud)**

349.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

350.    TM OS, Pelta, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

351.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that TM OS had a lawful Dealer in Products Licenses and were entitled to No-Fault Benefits when in fact TM OS was not lawfully licensed as they knowingly falsified the business owner and business address information on their application for a Dealer in Products; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; and (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were forged and/or duplicated, provided pursuant to predetermined fraudulent protocols and not based upon medical necessity.

352.    TM OS, Pelta, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through TM OS that were not compensable under New York no-fault insurance laws.

353.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $35,000.00 pursuant to the fraudulent bills submitted by TM OS, Pelta, and John Doe Defendant "1".

354.    TM OS, Pelta, and John Doe Defendant "1" extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

355.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
### Against TM OS, Pelta, and John Doe Defendant "1"
### (Unjust Enrichment)

356.     GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

357.     As set forth above, TM OS, Pelta, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

358.     When GEICO paid the bills and charges submitted by or on behalf of TM OS for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

359.     TM OS, Pelta, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that TM OS, Pelta, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

360.     The retention of GEICO's payments by TM OS, Pelta, and John Doe Defendant "1" violates fundamental principles of justice, equity and good conscience.

361.     By reason of the above, TM OS, Pelta, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $35,000.00.

## TWELFTH CAUSE OF ACTION
### Against Vital Craft, Pelta, and John Doe Defendant "1"
### (Common Law Fraud)

362.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

363.    Vital Craft, Pelta, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

364.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Vital Craft had a lawful Dealer in Products Licenses and were entitled to No-Fault Benefits when in fact Vital Craft was not lawfully licensed as they knowingly falsified the business owner and business address information on their application for a Dealer in Products; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; and (iv) the representation the Fraudulent Equipment issued to Insureds was based upon legitimate prescriptions by licensed healthcare providers identifying medically necessary DME when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME..

365.    Vital Craft, Pelta, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Vital Craft that were not compensable under New York no-fault insurance laws.

366.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by

reason of the above-described conduct in that it has paid at least $41,000.00 pursuant to the fraudulent bills submitted by Vital Craft, Pelta, and John Doe Defendant "1".

367.    Vital Craft, Pelta, and John Doe Defendant "1" extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

368.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**THIRTEENTH CAUSE OF ACTION**
**Against Vital Craft, Pelta, and John Doe Defendant "1"**
**(Unjust Enrichment)**

369.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

370.    As set forth above, Vital Craft, Pelta, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

371.    When GEICO paid the bills and charges submitted by or on behalf of Vital Craft for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

372.    Vital Craft, Pelta, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Vital Craft, Pelta, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

373.    The retention of GEICO's payments by Vital Craft, Pelta, and John Doe Defendant "1" violates fundamental principles of justice, equity and good conscience.

374. By reason of the above, Vital Craft, Pelta, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $41,000.00.

## FOURTEENTH CAUSE OF ACTION
### Against BSD, Rahman, and John Doe Defendant "1"
### (Common Law Fraud)

375. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

376. BSD, Rahman, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

377. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that BSD had a lawful Dealer in Products Licenses and were entitled to No-Fault Benefits when in fact BSD was not lawfully licensed as they knowingly falsified the business owner and business address information on their application for a Dealer in Products; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were forged and/or duplicated, provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; and (iv) the representation the Fraudulent Equipment issued to Insureds was based upon legitimate prescriptions by licensed healthcare providers identifying medically necessary DME

when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME.

378.    BSD, Rahman, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through BSD that were not compensable under New York no-fault insurance laws.

379.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $75,000.00 pursuant to the fraudulent bills submitted by BSD, Rahman, and John Doe Defendant "1".

380.    BSD, Rahman, and John Doe Defendant "1" extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

381.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
**Against BSD, Rahman, and John Doe Defendant "1"**
**(Unjust Enrichment)**

382.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

383.    As set forth above, BSD, Rahman, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

384.     When GEICO paid the bills and charges submitted by or on behalf of BSD for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

385.     BSD, Rahman, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that BSD, Rahman, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

386.     The retention of GEICO's payments by BSD, Rahman, and John Doe Defendant "1" violates fundamental principles of justice, equity and good conscience.

387.     By reason of the above, BSD, Rahman, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $75,000.00.

### SIXTEENTH CAUSE OF ACTION
**Against Luminex, Rahman, and John Doe Defendant "1"**
**(Common Law Fraud)**

388.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

389.     Luminex, Rahman, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

390.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Luminex had a lawful Dealer in Products Licenses and were entitled to No-Fault Benefits when in fact Luminex was not lawfully licensed as they knowingly falsified the business owner information on their application for a Dealer in Products; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and

medically necessary DME when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were forged and/or duplicated, provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; and (iv) the representation the Fraudulent Equipment issued to Insureds was based upon legitimate prescriptions by licensed healthcare providers identifying medically necessary DME when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME.

391.    Luminex, Rahman, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Luminex that were not compensable under New York no-fault insurance laws.

392.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $70,000.00 pursuant to the fraudulent bills submitted by Luminex, Rahman, and John Doe Defendant "1".

393.    Luminex, Rahman, and John Doe Defendant "1" extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

394.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SEVENTEEN CAUSE OF ACTION
### Against Luminex, Rahman, and John Doe Defendant "1"
### (Unjust Enrichment)

395.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

396.    As set forth above, Luminex, Rahman, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

397.    When GEICO paid the bills and charges submitted by or on behalf of Luminex for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

398.    Luminex, Rahman, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Luminex, Rahman, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

399.    The retention of GEICO's payments by Luminex, Rahman, and John Doe Defendant "1" violates fundamental principles of justice, equity and good conscience.

400.    By reason of the above, Luminex, Rahman, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $70,000.00.

## EIGHTHTEENTH CAUSE OF ACTION
### Against Pinnacle, Scala, and John Doe Defendant "1"
### (Common Law Fraud)

401.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

402.    Pinnacle, Scala, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO

in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

403.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Pinnacle had a lawful Dealer in Products Licenses and were entitled to No-Fault Benefits when in fact Pinnacle was not lawfully licensed as they knowingly falsified the business owner and business address information on their application for a Dealer in Products; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were forged and/or duplicated, provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; and (iv) the representation the Fraudulent Equipment issued to Insureds was based upon legitimate prescriptions by licensed healthcare providers identifying medically necessary DME when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME.

404.    Pinnacle, Scala, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Pinnacle that were not compensable under New York no-fault insurance laws.

405.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by

reason of the above-described conduct in that it has paid at least $54,000.00 pursuant to the fraudulent bills submitted by Pinnacle, Scala, and John Doe Defendant "1".

406.    Pinnacle, Scala, and John Doe Defendant "1" extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

407.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINETEENTH CAUSE OF ACTION
### Against Pinnacle, Scala, and John Doe Defendant "1"
### (Unjust Enrichment)

408.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

409.    As set forth above, Pinnacle, Scala, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

410.    When GEICO paid the bills and charges submitted by or on behalf of Pinnacle for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

411.    Pinnacle, Scala, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Pinnacle, Scala, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

412.    The retention of GEICO's payments by Pinnacle, Scala, and John Doe Defendant "1" violates fundamental principles of justice, equity and good conscience.

413.    By reason of the above, Pinnacle, Scala, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $54,000.00.

## TWENTIETH CAUSE OF ACTION
### Against Platinum Line, Abayev, and John Doe Defendant "1"
### (Common Law Fraud)

414.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

415.    Platinum Line, Abayev, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

416.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Platinum Line had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Platinum Line was not lawfully licensed as they knowingly falsified the business owner and business address information on their application for a Dealer in Products; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were forged and/or duplicated, provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; and (iv) the representation the Fraudulent Equipment issued to Insureds was based upon legitimate prescriptions by licensed healthcare providers identifying medically necessary DME

when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME.

417.    Platinum Line, Abayev, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Platinum Line that were not compensable under New York no-fault insurance laws.

418.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $288,000.00 pursuant to the fraudulent bills submitted by Platinum Line, Abayev, and John Doe Defendant "1".

419.    Platinum Line, Abayev, and John Doe Defendant "1" extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

420.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINETEENTH CAUSE OF ACTION
### Against Platinum Line, Abayev, and John Doe Defendant "1"
### (Unjust Enrichment)

421.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

422.    As set forth above, Platinum Line, Abayev, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

423.    When GEICO paid the bills and charges submitted by or on behalf of Platinum Line for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

424.    Platinum Line, Abayev, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Platinum Line, Abayev, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

425.    The retention of GEICO's payments by Platinum Line, Abayev, and John Doe Defendant "1" violates fundamental principles of justice, equity and good conscience.

426.    By reason of the above, Platinum Line, Abayev, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $288,000.00.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Harmony OS, Nexgen, TM OS, Vital Craft, Wellspring, BSD, Luminex, and Pinnacle for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Harmony OS, Nexgen, TM OS, Vital Craft, Wellspring, BSD, Luminex, and Pinnacle have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of action against the Paper Owner Defendants and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $1,000,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against the Paper Owner Defendants and the John Doe Defendants for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $1,000,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Radzik, Harmony OS and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $78,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Radzik, Harmony OS and John Doe Defendant "1" for more than $78,000.00  in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Bennissim. Nexgen, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $121,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Bennissim, Nexgen, and John Doe Defendant "1" for more than $121,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

H.      On the Eighth Cause of Action against Bennissim, Wellspring and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $239,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

   I.   On the Ninth Cause of Action against Bennissim, Wellspring, and John Doe Defendant "1" for more than $239,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

   J.   On the Tenth Cause of Action against Pelta, TM OS, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $35,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

   K.   On the Eleventh Cause of Action against Pelta, TM OS, and John Doe Defendant "1" for more than $35,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

   L.   On the Twelfth Cause of Action against Pelta, Vital Craft, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $41,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

   M.   On the Thirteenth Cause of Action against Pelta, Vital Craft, and John Doe Defendant "1" for more than $41,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper

   N.   On the Fourteenth Cause of Action against Rahman, BSD, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $75,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

O.      On the Fifteenth Cause of Action against Rahman, BSD, and John Doe Defendant "1" for more than $75,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

P.      On the Sixteenth Cause of Action against Rahman, Luminex, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $70,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Q.      On the Seventeenth Cause of Action against Rahman, Luminex, and John Doe Defendant "1" for more than $70,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

R.      On the Eighteenth Cause of Action against Scala, Pinnacle, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $54,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

S.      On the Nineteenth Cause of Action against Scala, Pinnacle, and John Doe Defendant "1" for more than $54,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

T.      On the Twentieth Cause of Action against Abayev, Platinum Line, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $288,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

U.     On the Twenty-First Cause of Action against Abayev, Platinum Line, and John Doe

Defendant "1" for more than $288,000.00 in compensatory damages, plus costs and interest and such

other and further relief as this Court deems just and proper.

Dated: May 14, 2025
        Uniondale, New York

                                    RIVKIN RADLER LLP


                                    By: _/s/ Barry I. Levy_____
                                        Barry I. Levy, Esq.
                                        Michael Vanunu, Esq.
                                        Joanna Rosenblatt, Esq.
                                    926 RXR Plaza
                                    Uniondale, New York 11556
                                    (516) 357-3000

                                    *Counsel for Plaintiffs Government Employees
                                    Insurance Company, GEICO Indemnity Company,
                                    GEICO General Insurance Company and GEICO
                                    Casualty Company*